681 A.2d 785

Heidi ROWINSKY, Executrix of the Estate of Gary Rowinsky, Deceased, and Heidi Rowinsky, in her own right, Appellant,

v.

Michael R. SPERLING, M.D., Catherine Phillips, M.D., C.P.U.P. Neurosurgical Assoc., Michael J. O'Connor, M.D., Comprehensive Epilepsy Center, Graduate Hospital, and Graduate Neurosurgery Consultants, Appellees.

Superior Court of Pennsylvania.

Argued April 30, 1996.

Filed July 19, 1996.

216

Joseph F. Ricchiuti, Philadelphia, for appellant.

Barbara S. Magen, Philadelphia, for appellees.

Before CIRILLO, President Judge Emeritus, DEL SOLE, J. and CERCONE, President Judge Emeritus.

CIRILLO, President Judge Emeritus:

Heidi Rowinsky, executrix of the estate of her husband, Gary Rowinsky, appeals from an order entered in the Court of Common Pleas of Philadelphia County granting judgment notwithstanding the verdict (JNOV) in favor of appellee Michael J. O'Connor, M.D. We reverse and remand for reinstatement of the jury verdict.

Mr. and Mrs. Rowinsky commenced a lawsuit against Dr. O'Connor[1] with regard to a temporal lobectomy procedure performed at Graduate Hospital on December 7, 1988.[2] The Rowinskys claimed that Dr. O'Connor failed to obtain Mr. Rowinsky's informed consent before performing the operation. Specifically, the Rowinskys claimed they were not informed of the risk of speech loss or memory loss after the procedure, and were actually assured that these risks did not exist at all. Following a jury trial, a verdict was entered in favor of the estate of Gary Rowinsky in the amount of $400,000.00. Dr. O'Connor filed a motion for post-trial relief. Following oral argument, the trial court granted Dr. O'Connor's motion for JNOV.

The evidence adduced at trial revealed the following. Early in 1987, Mr. Rowinsky, who was 31 years old, suffered a grand mal epileptic seizure. The seizures continued, and Mr. Rowinsky was eventually admitted to Graduate Hospital to deter-

1. The lawsuit was also filed against Graduate Hospital and several other physicians. The claims against the other defendants were resolved by stipulation, summary judgment, or non-suit.

2. The lawsuit was initially filed by Gary and Heidi Rowinsky; however, Gary Rowinsky died after the suit was filed. Heidi Rowinsky proceeded with her husband's claims as executrix of his estate. No claim was made that Mr. Rowinsky's death was related to the averments set forth in the lawsuit.

mine whether he was a candidate for a lobectomy, an operation designed to cure seizures. After initial screening tests, Dr. O'Connor, a neurosurgeon, and Dr. Sperling, a neurologist, both agreed that Mr. Rowinsky was a good candidate for the surgery. Before the lobectomy was performed, Mr. Rowinsky was admitted to Graduate for the surgical implantation of depth electrodes. The electrodes were implanted into the brain for monitoring purposes to localize the origin of the seizures. The electrodes were removed after approximately two weeks, and Drs. Sperling and O'Connor recommended that Mr. Rowinsky undergo the lobectomy.

Shortly before the scheduled surgery, a final test, the Wada test, was performed. The Wada test consisted of putting both sides of Mr. Rowinsky's brain "to sleep" at separate times. According to Mrs. Rowinsky, she and her husband were told that this test would determine in advance the location of damaged areas and assure that memory would be preserved after surgery. After the test, it was Dr. Sperling's belief that Mr. Rowinsky was not at risk for significant memory problems, and that the operation should go forward as planned.[3] Mrs. Rowinsky testified that on the day before the lobectomy, the Rowinskys were told that the operation would be performed while Mr. Rowinsky was awake to be sure he could speak and identify pictures throughout the procedure.

The operation was performed. Unfortunately, it did not cure Mr. Rowinsky's seizures, but in fact, made them worse. Further, the lobectomy caused severe speech and memory difficulties. Mr. Rowinsky was unable to return to work due to these difficulties.

On appeal, Mrs. Rowinsky raises one issue for our consideration:

Whether the trial court erred in granting JNOV in favor of defendant, where the court replaced the jury's finding in

3. The record reflects that Dr. Sperling specifically stated: "The Wada test showed that his [Mr. Rowinsky's] left hemisphere was dominant for language and that his right hemisphere was capable of supporting memory, so that he would not be at risk for a significant amnestic syndrome [memory loss] as a result of surgery."

favor of plaintiff with its own conclusion, and based that conclusion on one brief colloquy on cross examination, and failed to consider all of the evidence that supported the jury's verdict?

We initially set forth our well established standard of review:

A grant of judgment n.o.v. is appropriate only in a clear case, one where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. *See Scott v. Southwestern Mut. Fire Assn.,* 436 Pa.Super. 242, 647 A.2d 587 (1994). Thus, in order to determine the propriety of a decision granting judgment n.o.v. "[w]e must determine whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every reasonable inference that can reasonably be drawn from the evidence and rejecting all unfavorable testimony and inferences." *Id.,* 436 Pa.Super. at 247, 647 A.2d at 590. We will not reverse the trial court's decision absent the demonstration of either an abuse of discretion or an error of law. *Id.*

*Samuel Rappaport Family Partnership v. Meridian Bank,* 441 Pa.Super. 194, 201–02, 657 A.2d 17, 20 (1995); *see Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003 (1992) (judgment notwithstanding the verdict should only be entered in a clear case and any doubts must be resolved in the verdict winner's favor); *see also Pirozzi v. Penske Olds–Cadillac–GMC,* 413 Pa.Super. 308, 605 A.2d 373 (1992); *Ingrassia Construction Co., Inc. v. Walsh,* 337 Pa.Super. 58, 486 A.2d 478 (1984). "It is further well-settled that a judge should not reach his decision on how he would have voted if a member of the jury, but on the facts as they present themselves through the sieve of the jury's deliberations." *Jones v. Constantino,* 429 Pa.Super. 73, 81, 631 A.2d 1289, 1293 (1993) (citations omitted).

Mrs. Rowinsky asserts that her husband was not specifically informed of the risks involving speech and memory loss; to the contrary, Mr. Rowinsky was assured that these risks were eliminated before surgery by an exhaustive battery

of pre-operative tests. "[W]here a patient is mentally and physically able to consult about his condition, in the absence of an emergency, the consent of the patient is 'a prerequisite to a surgical operation by his physician' and an operation without the patient's consent is a technical assault." *Stover v. Association of Surgeons,* 431 Pa.Super. 11, 17, 635 A.2d 1047, 1050 (1993) (quoting *Gouse v. Cassel,* 532 Pa. 197, 202, 615 A.2d 331, 333–34 (1992) (citations omitted)). The Pennsylvania Supreme Court has defined the scope of "consent" as necessarily requiring "informed consent."

> [S]ince the agreement between the physician and his patient is contractual in nature, for there to be a valid consent it must be clear that both parties understand the nature of the undertaking and what the possible as well as expected results might be.... [I]t will be no defense for a surgeon to prove that the patient had given his consent, if the consent was not given with a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results.

*Gray v. Grunnagle,* 423 Pa. 144, 166, 223 A.2d 663, 674 (1966); *accord: Gouse,* 532 Pa. at 202–3, 615 A.2d at 334; *Stover,* 431 Pa.Super. at 17, 635 A.2d at 1050. Additionally,

> [a] physician or surgeon need not disclose all known information; however, the physician or surgeon is required to advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have the operation. Thus, the patient is assured that he will be provided with "all the material facts from which he can make an intelligent choice as to his course of treatment, regardless of whether he in fact chooses rationally."

*Gouse,* 532 Pa. at 203, 615 A.2d at 334 (quoting *Cooper v. Roberts,* 220 Pa.Super. 260, 266, 286 A.2d 647, 650 (1971)). (emphasis added).

■ The goal of the informed consent doctrine is to provide the patient with material information which is necessary to determine whether or not to proceed with the surgical procedure. *Sinclair v. Block,* 534 Pa. 563, 570, 633 A.2d 1137, 1140 (1993). If this vital information regarding risks, complications, and alternatives to surgery, which a reasonable person in the patient's position would have considered significant, is not disclosed to the patient, the surgeon is held liable. *See Gouse,* 532 Pa. at 202, 615 A.2d at 333. The determination of what a reasonable patient would do or consider significant under certain circumstances is for the jury to decide; expert assistance is not necessary. *Sagala v. Tavares,* 367 Pa.Super. 573, 579, 533 A.2d 165, 168 (1987) (citing *Cooper,* 220 Pa.Super. at 260, 286 A.2d at 651).

■ Guided by our scope of review, we must determine whether sufficient competent evidence existed to sustain the verdict; we view such evidence in the light most favorable to Mrs. Rowinsky. *Samuel Rappaport Family Partnership, supra.* At trial, Mrs. Rowinsky presented the expert testimony of a neurosurgeon, Dr. Donald Penney. Dr. Penney opined that because Mr. Rowinsky's seizures were located in his left temporal lobe, the lobectomy posed a significant risk of harm to speech or memory. Dr. O'Connor's expert did not dispute this; Dr. John Vires, director of neurosurgery, agreed that the operation posed a risk to speech and memory, and that a patient should be informed of the risk. Thus, the only issue for the jury to decide was whether the information provided to Mr. Rowinsky was sufficient to inform him of those risks.

Mrs. Rowinsky testified that the risks of surgery which were presented to her husband included death (as is the case in any surgery), stroke, and loss of peripheral vision; neither speech loss nor memory loss were mentioned.[4] Mrs. Rowinsky introduced into evidence the Graduate Hospital Epilepsy

4. Mrs. Rowinsky further testified that she was told the reason her husband would be awake during surgery was so the doctors could make sure he could speak, identify pictures, and respond to questions. She was never told there was a chance that as a result of the surgery he would not be able to perform these normal functions.

Center Newsletter. The Rowinskys received the newsletter several months before the surgery. The newsletter, in discussing surgery for patients with epileptic seizures, stated that the Wada test was performed in part "to assure that memory will be preserved after surgery." Additionally, when discussing the risks involved in surgery, the newsletter stated: "Careful evaluation in advance of surgery insures that the area to be removed is not vital for normal function."[5] Furthermore, Dr. Sperling's (Dr. O'Connor's colleague) deposition testimony was read into the record, revealing Dr. Sperling's belief that the Wada test indicated Mr. Rowinsky would not be at risk for short-term memory difficulties.

When we view the evidence in the light most favorable to Mrs. Rowinsky, we find that this is not a "clear case" *Samuel Rappaport Family Partnership, supra,* warranting a JNOV. The trial court focused only on one segment of cross-examination questions directed at Mrs. Rowinsky to support its entry of JNOV. On cross-examination, Mrs. Rowinsky was asked:

Q. Did you understand that the reason it was being done in this fashion and the reason that Gary was going to be continually asked questions and shown pictures during this operation was because of the **potential that his speech or his memory, his ability to answer these questions appropriately could be affected by the operation?** (emphasis added)

A. We understood it to be done that way to insure that he wouldn't have any problems with those areas.

Q. But the potential was there, wasn't it? That is why they were doing it this way because of that potential?

A. Yes.

Even if this colloquy raised some doubt that the Rowinskys were not aware of the risk of harm to Mr. Rowinsky's speech and memory, this doubt was removed on redirect examination, during which Mrs. Rowinsky explained again that she and her husband believed any risk of harm to memory had been

5. We recognize that the newsletter received by the Rowinskys, while it supports their case, is not direct evidence of failure to inform since it was not issued solely to them or tailored specifically to their case.

eliminated.   On redirect, Mrs. Rowinsky was asked the follow-
ing questions by her attorney:

Q.  When you read that [the newsletter from Graduate
Hospital] did you understand that there was still some risk
that memory wouldn't be preserved?

A.  No.

Q.  Another paragraph or another sentence [from the
newsletter] you read: What are the risks involved in sur-
gery?  Careful evaluation [the Wada test] in advance of
surgery insures that the area to be removed is not vital to
normal function.  If it were then the operation would not be
recommended.  What do you think the word insures meant?
**Did that indicate to you that there was a risk that the
tissue removed would be vital?** (emphasis added)

A.  **No.** (emphasis added)

This re-direct examination confirms that Mrs. Rowinsky and
her husband did **not** believe Mr. Rowinsky's speech and
memory functions were at any risk of harm.   In fact, the
Wada test purportedly insured that memory loss would not
occur.  "[I]t will be no defense for a surgeon to prove that the
patient had given his consent, if the consent was not given
with a **true understanding of the nature of the operation
. . . and the possible results.**" *Gouse*, 532 Pa. at 203, 615
A.2d at 334 (emphasis added).   Clearly, the Rowinskys were
not given a "true understanding" of the operation's possible
results for purposes of informed consent.   Mrs. Rowinsky's
testimony, both on direct and re-direct, is more than sufficient
evidence by which the jury could have reasonably concluded
that she and her husband were not informed of material risks
or complications which a reasonable person would have consid-
ered significant in deciding to have the recommended surgery.
*Gouse, supra.*

The appellees argue that even if the plaintiff proves a
failure to obtain informed consent, he must also prove, by way
of competent expert evidence, that the surgery at issue caused
the claimed injury.   This argument is meritless.   The Penn-
sylvania Supreme Court has expressly stated the following:

"We have held that a physician or surgeon who fails to advise a patient of material facts, risks, complications, and alternatives to surgery which a reasonable [person] in the patient's position would have considered significant in deciding whether to have the operation is liable for damages which ensue, **and the patient need not prove that a causal relationship exists between the physician's or surgeon's failure to disclose information and the patient's consent to undergo surgery.**"

*Sinclair*, 534 Pa. at 568–69, 633 A.2d at 1140 (citing *Gouse*, 532 Pa. at 202, 615 A.2d at 333) (emphasis added). Since Mrs. Rowinsky has established that she and her husband were not informed of certain material risks, recovery is permitted under the doctrine of informed consent, regardless of causation and actual damages. In granting JNOV in favor of Dr. O'Connor, the trial court failed to grant the verdict winner the benefit of every reasonable inference. *Samuel Rappaport Family Partnership, supra.* Our reading of the record indicates this is not a clear case and, therefore, reasonable minds **could** fail to agree that the verdict was improper. Mrs. Rowinsky testified at length regarding the risks she and her husband were and were not informed of and, presumably, this testimony was believed by the jury. Given this testimony, the jury had sufficient evidence upon which to enter a verdict in favor of appellant.

When we consider the evidence in the light most favorable to the verdict winner, granting her the benefit of all reasonable inferences, *Samuel Rappaport Family Partnership, supra,* we believe the testimony adduced at trial reflected that the Rowinskys were not aware of the risk of harm to Mr. Rowinsky's speech and memory. For this reason, we find the trial court abused its discretion in granting a judgment notwithstanding the verdict. *Jones, supra.*

Accordingly, we reverse the judgment of the trial court and remand for reinstatement of the jury verdict.

Reversed and remanded. Jurisdiction relinquished.