## Zhu v. Erie Insurance Group

C.P. of Lancaster County, no. CI-97-07298.

*Michael P. McDonald,* for plaintiff.
*William E. Benner Jr.,* for defendant.

FARINA, *J.,* February 25, 1998—Before the court is plaintiff Yuchen Zhu's motion to vacate an arbitration award entered under 42 Pa.C.S. §7301 of the Uniform Arbitration Act. For the reasons that follow, the motion will be denied.

On February 3, 1991, plaintiff Yuchen Zhu was a passenger in a motor vehicle that was involved in a serious accident caused by the alleged negligence of another driver. The car in which Zhu was a passenger was owned by Wai Ming Sham and Lisa Sham (the insureds) and insured by Erie Insurance Group. Zhu suffered serious and extensive bodily injuries and made a policy limit demand against the tort-feasor's insurance

carrier, which it paid. Because Zhu claimed damages which exceeded the limits received, he subsequently demanded underinsured motorist (UIM) coverage from Erie available to him as a passenger of the Shams' vehicle. Erie responded that while the Shams' bodily injury liability coverage was $100,000 per person and $300,000 per occurrence, UIM coverage was limited to $15,000 per person and $30,000 per occurrence as a result of the insureds' waiver of the standard uninsured (UM) and UIM limits.

At the time of the accident, the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §1731, required that UM/UIM limits be equal to bodily injury liability limits unless insureds waived this condition by means of a statutorily mandated waiver form entitled "Important Notice" and containing the language set forth in 75 Pa.C.S. §1791. The Shams signed a written waiver of UM/UIM in the insurance application but it did not comply with section 1791. The ordinary consequence of this statutory violation is that UM/UIM policy limits are deemed to equal the bodily injury policy limits, unless the insurer can otherwise establish a valid and effective waiver of UM/UIM coverage by the insureds. Thus, Erie must prove that the Shams' nonstandard (*i.e.,* statutorily defective) waiver was effective, otherwise their UIM coverage would remain the same as the bodily injury liability coverage, $100,000 per person and $300,000 per occurrence.

Pursuant to the terms of the insurance policy, the parties submitted this case to arbitration on May 20, 1997. The parties agreed to bifurcate the legal issue and the issue of damages. During arbitration, the panel heard evidence concerning whether the Shams voluntarily elected UIM limits in an amount less than their liability limits. The arbitration panel found 2-1 that

Erie had met its burden of showing that the waiver was effective.

Both parties agree that the policy provides for underinsured motorist arbitration pursuant to the Arbitration Act of 1927. The scope of review under the Arbitration Act of 1927, known as the error of law standard, provides as follows:

"A court in reviewing an arbitration award pursuant to this subchapter shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury, the court would have entered a different judgment or a judgment n.o.v." 42 Pa.C.S. §7302(d)(2).

Thus, judgment n.o.v. review standards are applicable to arbitration awards in UM/UIM cases. Grant of judgment n.o.v. is appropriate only in a clear case, one where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. *Rowinsky v. Sperling,* 452 Pa. Super. 215, 220, 681 A.2d 785, 788 (1996). A court must determine whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every reasonable inference that can reasonably be drawn from the evidence and rejecting all unfavorable testimony and inferences. *Id.* Every inference of fact must be drawn in favor of sustaining the arbitration award. *Boyle v. State Farm Mutual Automobile Insurance Co.,* 310 Pa. Super. 10, 456 A.2d 156 (1983).

Applying these principles of law to the present facts, and viewing the evidence presented to the arbitration panel in a light most favorable to Erie, the award winner, the following facts emerge. Mr. and Mrs. Sham signed a waiver that did not comply with section 1791 in the insurance application electing lower UM/UIM cover-

age.[1] Mrs. Sham testified that she customarily read and understood documents before signing them, otherwise she would not sign a document.[2] Pursuant to her custom, the arbitrators could infer, and Mrs. Sham testified, that she would have read the provision of the policy entitled "Selection of Lower Limits of Uninsured/Underinsured Motorist Coverage" before signing it. That section provides "I/We, the named insured, reject uninsured/underinsured motorist coverage limits equal to my/our bodily injury liability limits. Instead, I/We select uninsured/underinsured motorist coverage limits of: $15 per person [$15,000], $30 per accident [$30,000]." [3] Mrs. Sham testified that this provision was something she could understand and if she had questions she would have asked them.[4] As the Erie policyholder, Mrs. Sham is not claiming she did not get the coverage for which she paid and thought she was getting; she understood that the waiver provision was "something different than the regular policy . . . [t]hat it became the 15/30 for a car." [5] Mrs. Sham further testified that her husband at the time of the signing, now her ex-husband, was also in the practice, custom, or habit of reading and understanding documents before they were signed.[6]

David Gebhard, the insurance agent who sold the policies to the Shams, testified that he first interacted with the Shams when he helped Mr. Sham purchase business and health insurance for his restaurant.[7] More notably, Mr. Gebhard remembered that Mr. Sham cus-

---

1. Notes of Arbitration Testimony (N.A.T.) at 12, 36.
2. *Id.* at 7.
3. *Id.* at 8, 13.
4. *Id.* at 8.
5. *Id.* at 10, 29.
6. *Id.* at 11.
7. N.A.T. at 42.

tomarily asked many questions and was very detailed in what he wanted as compared to other customers who only wanted to know the bottom line price of the policy.[8] As for the February 1990 auto insurance policy with Erie, Mr. Gebhard testified that although he remembers meeting with the Shams to discuss this policy, he does not remember the specifics of the discussion.[9] Customarily, Mr. Gebhard automatically quoted $100,000/$300,000 coverage for both liability and UM/UIM coverage because the more business he sold, the more money he made; he knew he would get more business quoting higher limits.[10] During 1990, Mr. Gebhard testified that he was aware UM/UIM coverage had to be offered in an amount equal to liability coverage and that lowering these limits required a written waiver.[11] According to his custom, Mr. Gebhard testified that he was definitely certain he would have quoted a $100,000/$300,000 limit and that in order to lower these limits, a customer would have to specifically request that they wanted lower limits.[12] Once a customer requested lower coverage, Mr. Gebhard would explain UM/UIM coverage.[13] Before a customer signed the application, Mr. Gebhard testified that he would go over the policy page by page which included, if applicable, reviewing the section which lowered limits of UM/UIM coverage.[14]

Pamela Evans, also an Erie insurance agent, testified that she had written an automobile policy for Mr. Sham

8. *Id.* at 44.
9. *Id.* at 45.
10. *Id.* at 47-48.
11. *Id.* at 49.
12. *Id.* at 49.
13. N.A.T. at 50-51.
14. *Id.* at 52-53.

in January of 1995, issued by Progressive Insurance Company. This policy had bodily injury liability coverage in the amount of $50,000 per person, $100,000 per accident and UM/UIM coverage in the amount of $15,000 per person and $30,000 per accident, but the lower UM/UIM limits were accomplished with the statutorily required section 1791 waiver form.[15]

The issue which the arbitration panel addressed is whether sufficient evidence was presented to establish that the insureds waived the higher bodily injury limits for their UM/UIM coverage. The leading case defining the insurer's burden of proof is *Johnson v. Concord Mutual Insurance Co.,* 450 Pa. 614, 300 A.2d 61 (1973), in which the Pennsylvania Supreme Court held that "a waiver of uninsured motorist coverage is effective only if the waiver manifests the intentional relinquishment of this legislatively granted right of insurance protection." *Id.* at 620, 300 A.2d at 64. "To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." *Id.* at 620, 300 A.2d at 65. (citations omitted)

In *Tukovits v. Prudential Insurance Co. of America,* 448 Pa. Super. 540, 672 A.2d 786 (1986), the Superior Court established a two-prong test to determine whether an insured made a knowing and intelligent election in writing for lower UM/UIM coverage. *Id.* First, the court questioned whether the insured was made aware of the coverage that was available, then, secondly, the court looked to events which occurred prior to and after the written election for further evidence that the insured acted knowingly and intelligently. *Id.* at 548, 672 A.2d at 790. The court referred to possible relevant

15. *Id.* at 85-87.

events which might establish the knowing and intelligent component of waiver such as whether the insured previously obtained the same level of UM/UIM coverage, whether the premiums paid reflected the reduced level of coverage, whether the insured ever questioned the level of UM/UIM coverage, whether vehicles were amended or added to the policy, and whether the forms evidencing the transaction reflect the level of coverage. *Id.*

The Superior Court in *Tukovits* held that the trial court's entering summary judgment upon finding no waiver of higher bodily injury limits for UIM coverage was proper where the trial court found there was no evidence that the deceased insured was informed of or that he waived the benefits and limits available for or that he understood UIM insurance. *Id.* at 550, 672 A.2d at 790. The court recognized that evidence of numerous renewals and amendments tended to raise an inference that the insured knowingly reduced his UM/UIM coverage when he signed the waiver. *Id.* at 550, 672 A.2d at 791. Yet, because of the death of the insured and the insurance agent, no testimonial evidence was available to establish that the insured read the policy, had it explained to him, or realized the magnitude of making and signing the waiver. *Id.* Without such evidence, the court found the remaining evidence insufficient to prove waiver as a matter of law. *Id.*

Given the facts established and the legal principles to be applied, we are satisfied that Erie presented sufficient evidence for the arbitrators to find that the Shams' waiver was effective. Here, unlike in *Tukovits,* there was ample testimonial, direct and circumstantial evidence to infer that the insureds read the policy, had it explained to them, understood it, and realized the magnitude of waiving the higher bodily injury limits

for lower UM/UIM coverage when they signed the waiver in the policy application. Mrs. Sham testified that both she and her husband customarily asked questions and did not sign things until they understood them. Further, Mr. Gebhard testified that he, in February 1990, during the time period he sold the policy to the Shams, customarily quoted UM/UIM limits equal to bodily injury liability limits to new policyholder prospects. Lower UM/UIM limits were not offered unless the customer specifically requested them. Viewing the facts in a light most favorable to Erie, the award winner, the evidence was sufficient for the arbitrators to conclude the Shams were aware of the nature of UM/UIM coverage that was available to them.

Turning to the second prong of *Tukovits,* sufficient evidence was presented for the arbitration panel to infer that the insureds acted knowingly and intelligently. Mrs. Sham testified that both she and her husband would have read the section of the policy entitled "Selection of Lower Limits of Uninsured/Underinsured Motorist Coverage" and would have asked questions if there was any part they did not understand. Mr. Gebhard specifically remembered that Mr. Sham was a more sophisticated buyer of insurance in that he customarily asked questions and did not merely ask for the "bottom line" price of the coverage. The language contained in the policy specifically states that the insureds were rejecting UM/UIM motorist coverage limits equal to their bodily liability limits and instead were selecting lower UM/UIM coverage. While proof of subsequent acts or knowledge standing alone will ordinarily not support a finding that such knowledge existed on an earlier date, the evidence that Mr. Sham subsequently lowered his UIM limits supports an inference, when coupled with the other supporting evidence, that Mr. Sham may have known of this alternative in 1990 when

the Erie policy was obtained. Also significant is Mrs. Sham's testimony that as a policyholder, she was not seeking to challenge the UM/UIM coverage limits. Based upon all the evidence, the arbitrators cannot be faulted for concluding the Shams knew exactly what they were doing when they elected lower UM/UIM limits.[16] Mr. Zhu, a stranger to the policy, is unconvincing in his claim the Shams did not effectively waive their coverage.

Accordingly, we enter the following:

## ORDER

And now, February 25, 1998, upon consideration of petitioner Yuchen Zhu's motion to vacate an arbitration award and the briefs of the parties in regard thereto, the motion is denied.

---

16. Although the evidence of waiver by Mr. Sham may not be as compelling as that of Mrs. Sham, it is sufficient. Moreover, the law appears to be that waiver by one joint named insured is sufficient to bind all named insureds in a policy. *Hepler v. Liberty Mutual Fire Insurance Co.,* 7 D.&C.4th 521 (Cumb. Co. 1990); *Liberty Mutual Fire Insurance Co. v. Lindsey,* 3 D.&C.4th 659 (York Co. 1989).