# Haupt v. Commonwealth, Department of Public Welfare

C.P. of Bucks County, no. 95005348-14-2.

*Edwin L. Stock,* for plaintiffs.

*Allan E. Ells,* for defendant Department of Public Welfare.

*Joseph M. Walker,* for defendants St. Mary Medical Center and Hannah.

BIESTER, *J.,* May 10, 2000—The plaintiffs, Gary L. Haupt and Jody Zimmerman, administrators of the estate of Gary J. Haupt, the decedent, commenced this lawsuit by filing a complaint in the Court of Common Pleas of Bucks County in July of 1995. The plaintiffs are the natural parents of decedent who was born on October 14, 1977. The complaint named the Department of Public Welfare of the Commonwealth of Pennsylvania, St. Mary Medical Center and Dr. Brian Hannah as defendants. In 1998, St. Mary Medical Center was released as a defendant pursuant to a stipulation signed by the parties to this suit. Dr. Brian Hannah entered into a settlement with plaintiffs during the trial and is no longer a defendant in this case. The Department of Public Welfare operated a psychiatric school and hospital known as Eastern State School and Hospital. The plaintiffs' claims were for the wrongful death of Gary J. Haupt, and a survival action on behalf of the estate of Gary J. Haupt.

Following a six-day jury trial in November 1999, the jury was charged with determining whether the Department of Public Welfare, acting through Eastern State School and Hospital and its personnel, was grossly negligent in this case. The jury determined that the Department of Public Welfare was not grossly negligent, and, accordingly, entered a verdict in favor of the defendant. Instantly, plaintiffs move for entry of judgment n.o.v., or, in the alternative, for a new trial.

In a light most favorable to the Department of Public Welfare, as verdict winner, the facts adduced at trial are the following:

The decedent, Gary J. Haupt, obtained morphine sulfate pills which were smuggled into Eastern State School and Hospital by another student returning from a weekend home visit who had put the pills into a plastic bag inside of a plastic bottle of hair conditioner. That student's personal effects were examined by Eastern State staff member Peggy Perkins, whose inspection revealed that the bottle was about one-quarter full, the contents of which did not appear to be the normal consistency of hair conditioner. She subsequently confiscated the bottle, and placed it to the side to later dispose of it due to her suspicions about its contents.

After Ms. Perkins completed her inspection, another student arrived back from a weekend pass, and Ms. Perkins received a report of a different student who had run away from home. Due to her attention to these other students, and because of an ensuing shift change, Ms. Perkins forgot about the confiscated conditioner bottle which she left in the trash can in the office. Such was the testimony as stipulated by the parties.

Shortly after this time, the student whose pills had been confiscated, with the aid of another student, retrieved the confiscated bottle from the trash can. Later that night, Ms. Perkins witnessed another staff member remove trash bags from the cottage, and she had assumed that the confiscated bottle was removed and taken out to the trash. That was the evidence offered.

On March 2, 1995, decedent went to the school's canteen. In response to rumors that drugs had been passed around there, the staff spoke with him, and he eventually stated that he had taken "a handful," between 15

and 22 of the morphine sulfate pills. He then turned over eight pills to the staff, and his room was searched.

Eastern State was a psychiatric facility which treated children who had behavioral problems. It had a pediatric clinic that could handle simple minor medical problems such as colds or the flu. Dr. Ordentlich, the psychiatrist on call that evening, was notified, and she came to the cottage, saw the decedent and completed the paperwork to send him to St. Mary's Hospital for treatment for an overdose and observation. Before sending decedent to St. Mary's, Dr. Ordentlich called St. Mary's and informed them that he was to be treated for an overdose of morphine sulfate.

At St. Mary's, Dr. Hannah, the emergency room physician, ordered Narcan, an antidote to the morphine sulfate, to be administered, and had blood drawn for analysis. Although Dr. Hannah only ordered one dose of Narcan to be administered, due to a misunderstanding, the decedent actually received two doses.

After several hours of observation, decedent was medically cleared from St. Mary's at about 3:15 a.m. Upon the suggestion of Ms. Mentzor, the discharge nurse at St. Mary's, Dr. Hannah agreed that decedent should be checked every 30 minutes after being returned to Eastern State. Consequently, those instructions were verbally given to the person who had accompanied the decedent to the hospital, but Ms. Mentzor did not know if she said he should be aroused when doing so, and except for "boilerplate" printed instructions which made no reference to any 30-minute checks, no other instructions were given. Dr. Hannah's reason for the 30-minute checks was his concern that the decedent might be able to gain access to more morphine sulfate pills, and not because of

any concern about lingering effects from the morphine sulfate.

At decedent's cottage at Eastern State in New Hope, staff member Helen Cimino checked decedent's respiration, because morphine is a respiratory depressant, and it was fine. Ms. Cimino discussed with another staff member, Arthur Woods, instructions that decedent was to be checked and aroused every half-hour in addition to the required 15-minute checks for all students at Eastern State. Mr. Woods was instructed to elicit a response from decedent. Ms. Cimino personally checked decedent at 4:30 a.m. and easily aroused him from his sleep. She called Mr. Woods every 30 minutes to be sure that he had aroused him, and she last spoke with Mr. Woods at 6:30 a.m.

According to Ms. Cimino, she did not believe that decedent required additional medical care beyond the instructions that were provided to her. Eastern State is a psychiatric hospital, and is not equipped for medical emergencies. If a medically-cleared student returns, she believed that that meant that the student is fine. Ms. Cimino testified that she did not leave the New Hope cottage until 7:10 a.m. on March 3, 1995, and that she had received no call concerning the decedent.

Ms. Cimino spoke to Dr. Ordentlich upon decedent's return to Eastern State. After being apprised of decedent's condition, no additional instructions were given to Ms. Cimino by Dr. Ordentlich.

Mr. Woods, the aide assigned to the New Hope cottage in which decedent stayed, told the state police that he had checked on him every half-hour, during which he went into the room to check and shake him to arouse him. Decedent would say "something . . . other times he

would just make a noise like when you first get up." (R. 11/23/99, p. 93.)

At the time around Mr. Haupt's death, Ed Pacini was the aide who worked the 7 a.m. to 3:30 p.m. shift. He arrived at work at approximately 7 a.m. Upon his arrival, Mr. Woods apprised him of the situation with decedent. From 7:10 to 7:15 a.m., Mr. Pacini began to awaken the other patients, starting at the opposite end of the hall, so that decedent would be aroused last. Mr. Pacini got no response when attempting to arouse decedent. Decedent did not appear normal, and Mr. Pacini ran to the cottage office and telephoned the nurses.

After receiving the call from Mr. Pacini, Nurse Donohue came to the cottage, found decedent cyanotic, without pulse or respiration, but sweating, and the body was warm. She began CPR, and Dr. Ordentlich was called, as was an ambulance. Decedent was pronounced dead at 8:45 a.m. by the deputy coroner. The autopsy and toxicology study indicated that the cause of death was an overdose of morphine sulfate.

Medical evidence adduced at trial established that Narcan, the antidote to morphine sulfate, when administered intramuscularly, which was done in this case, will have a significantly longer half-life and provide protective effects shielding someone from the effects of morphine sulfate longer, compared to Narcan administered intravenously. Once the Narcan wears off, and the peristaltic action resumes, a large volume of toxic morphine would be released into the bloodstream, and a patient can rapidly develop respiratory distress and die in a very short period of time.

Defendant presented medical testimony to the effect that one who ingested a large dose of morphine sulfate should be admitted to an intensive care unit for electri-

cal and clinical monitoring. The patient should not be sent to an ordinary medical surgical floor, let alone a facility where it was unknown if there even was such a unit. Further, people coming under narcotic effects may well emit a nonverbal response which may be construed as being aroused. As was done with the decedent, when Narcan is administered in two different modes of treatment of long-acting morphine sulfate, the body may not be subjected to fatal morphine levels for as long as 12 hours. However, once the Narcan wears off, there can be a rapid deterioration and cessation of respiration. These are essentially the relevant facts adduced at trial.

Instantly, we must consider plaintiffs' first motion which comes in the form of a judgment n.o.v. In reviewing this motion, we are bound to consider the evidence in a light most favorable to the verdict winner, who is given the benefit of every favorable inference which may be reasonably drawn from the evidence, while rejecting all unfavorable testimony and inferences. *Rowinsky v. Sperling,* 452 Pa. Super. 215, 220, 681 A.2d 785, 788 (1996) (citing *Scott v. Southwestern Mutual Fire Association,* 436 Pa. Super. 242, 647 A.2d 587 (1994)). Judgment n.o.v. must not invade the province of the factfinder; the jury must resolve questions of fact. Furthermore, questions of credibility and conflicts in evidence are for the jury to resolve. *Foflygen v. Allegheny General Hospital,* 723 A.2d 705, 711 (Pa. Super. 1999). Also, it is well settled that the trial judge must not reach his decision on how he would have voted as a juror, but on the facts as they present themselves through the sieve of the jury's deliberations. *Jones v. Constantino,* 429 Pa. Super. 73, 81, 631 A.2d 1289, 1293 (1993).

Pursuant to statute and prior precedent, in order to hold defendant liable for the death of decedent, gross negli-

gence must first be found. This court charged the jury with the applicable standard of gross negligence as the following: "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity or indifference. The behavior of the defendant through its agents and servants would have to be flagrant, grossly deviating from the ordinary standard of care." (R. 11/24/99, p. 66.)

Under this requisite standard of care, we cannot find that this case is so clear as to establish gross negligence such that no two reasonable minds could fail to agree that the verdict was improper.

The first alleged incidence of gross negligence by plaintiffs involves the circumstances in which the morphine sulfate pills came into the facility. At that time, the staff member did confiscate the bottle containing the pills because she was suspicious as to its contents. No evidence adduced at trial demonstrated that she was sure that the contents of the bottle were contraband. Moreover, it is reasonable for the jury to have believed that considering the circumstances, the staff member's actions did not constitute gross negligence. At the time, the staff member received a new report concerning a different student who had run away from home. Also, the scene may have been somewhat more chaotic because of a shift change. Although the staff member's unguarded placement of the bottle of pills can be viewed as negligent, it is quite reasonable for the jury to believe, considering the circumstances, that these actions did not amount to gross negligence. The existence of negligence must be determined on facts as they appeared at the time of the alleged negligence, and not just a judgment based on consequences.

Next, plaintiffs argue that "the clearest example of gross negligence in this case concerns psychiatric aide Arthur Woods and the checks he was supposed to make of Gary following Gary's return to ESSH." (Brief in support of plaintiffs' motion for post-trial relief, p. 20.) Mr. Woods was supposed to check and arouse the decedent every half-hour. Mr. Woods did testify that he did indeed make these checks on time. Furthermore, the flow sheet, signed by Mr. Woods, indicates that decedent was checked and aroused every half-hour from 4 a.m. to 7 a.m. Plaintiffs, however, point to some inconsistencies in Mr. Woods' testimony with statements he made to police, and also with statements by Ms. Cimino. Mr. Woods stated that he checked and aroused decedent at 4 a.m. and 4:30 a.m., as per instructions. However, Nurse Cimino stated that decedent was in bed, but not asleep when she left his cottage at 4:30 or 4:45 a.m. Plaintiffs point to this inconsistency and question why decedent had to be checked and aroused at 4 a.m. and 4:30 a.m., when he was not yet asleep. The obvious suggestion asserted by plaintiffs is that Mr. Woods falsified these records in an attempt to protect himself from any potential liability. However, the jury heard this evidence, and was entitled as the fact-finder to give conflicting testimony as significant or as little weight as it chose. Mr. Woods testified that he checked and aroused decedent every half-hour from 4 a.m. to 7 a.m., and the jury was entitled to accept his testimony and not find gross negligence in this conduct. Undoubtedly, there are some possible inconsistencies in the testimony of certain Eastern State staff members. However, the jury was entitled to find any inconsistency in favor of the defendant.

Plaintiffs also point to evidence offered by their medical experts, which indicates that decedent was not ap-

propriately monitored or cared for by Eastern State. While experts can testify regarding deviations from the standard of care, it is for a jury to determine if those deviations rise to the level of gross negligence. Dr. Kruszewski, plaintiffs' medical expert, testified that Dr. Ordentlich should have told Nurse Cimino that decedent needed to be observed on a one-to-one basis. Further, Dr. Kruszewski testified that Dr. Ordentlich should have called Dr. Hannah at St. Mary's and asked him what happened, and otherwise been more proactive in her care for decedent.

However, Dr. Kruszewski did not causally relate these alleged instances of negligence to the death of Haupt. It is reasonable to believe that the level of monitoring of decedent was not grossly negligent, despite Dr. Kruszewski's testimony that one-to-one monitoring was needed. Further, the jury could reasonably have believed that Mr. Haupt would have died despite these precautions. Also, it is not clear what Dr. Ordentlich would have learned that could have saved decedent's life by calling Dr. Hannah, especially since Dr. Hannah had just medically cleared decedent from St. Mary's Hospital.

It is quite possible that the jury believed that St. Mary's was negligent in medically clearing decedent in the first place, especially considering the fact that Eastern State was not equipped to handle properly emergency situations. However, in analyzing all of the evidence and circumstances of the case, we cannot grant plaintiffs' motion for judgment n.o.v.

It is difficult enough to set aside a jury determination as to simple negligence. That burden becomes enormous when dealing with gross negligence. The plaintiffs have simply not met those standards in this case.

Similarly, we cannot find that the jury's verdict so shocks one's sense of justice, so as to require a new trial. While many of defendant's actions seemed negligent, we cannot say that any of these actions, or the aggregate of these actions, rose to the high level required for gross negligence. As such, plaintiffs' motion for a new trial will be denied. For the aforementioned reasons, we enter the following order.

## ORDER

And now, May 10, 2000, it is hereby ordered and decreed that plaintiffs' motion for judgment n.o.v. and motion for new trial are denied, and the jury's verdict in this case is affirmed.