The BIRTH CENTER, Appellant,

v.

The ST. PAUL COMPANIES, INC., Sharon Dawson–Coates and Al Afonso, Appellees. (Three Cases.)

The Birth Center, Appellee,

v.

The St. Paul Companies, Inc., Sharon Dawson–Coates and Al Afonso.

Appeal of The St. Paul Companies, Inc., Appellant.

Superior Court of Pennsylvania.

Argued Jan. 28, 1998.

Filed March 9, 1999.

Reargument Denied May 3, 1999.

John S. Brooks, Media, for The Birth Center.

Thomas P. Wagner, Philadelphia, for The St. Paul Companies, Inc., Sharon Dawson-Coates and Al Afonso.

Before McEWEN, President Judge, and KELLY and HOFFMAN *, JJ.

KELLY, J.:

¶ 1 In these consolidated appeals we must determine whether the trial court properly granted judgment notwithstanding the verdict ("J.N.O.V.") in favor of Appellee, St. Paul Companies, Inc. ("St. Paul"), where the jury found sufficient evidence that St. Paul had acted in bad faith in refusing to negotiate and settle a medical malpractice suit brought by a third party against its insured, Birth Center. We must also decide whether compensatory damages may be available to the insured in this context where the insurer ultimately pays the excess verdict in the underlying third-party action. For the reasons set forth as follows, we hold that there was sufficient evidence to support the jury's finding of bad faith and that compensatory damages may also be available to the insured in the context of the insurer's unreasonable refusal to settle a claim within the policy limits. Accordingly, we reverse and remand with instructions.

---

* Judge Hoffman did not participate in the decision of this case.

1. In addition to Birth Center, the Norris complaint originally named as defendants Kate McHugh and Despina Soppas, M.D. ("Dr. Soppas"), individually and as employees of Birth Center. Kate McHugh, the attending midwife during the delivery of Lindsey Norris, settled the

## FACTS

¶ 2 The present case arises out of St. Paul's refusal to negotiate and settle a medical malpractice action, *Norris v. Birth Center and Despina Soppas, M.D.* ("*Norris Case*"), in connection with the birth of the Norrises' child.[1] The *Norris Case* was initiated against Birth Center on November 16, 1986. The Norrises alleged that Birth Center's negligence during the birth of their daughter caused her to suffer severe and permanent brain damage. The Norris complaint alleged, *inter alia,* that Birth Center failed to provide proper monitoring of the infant *in utero* in order to diagnose fetal distress at a time when the infant could have been delivered without permanent and serious brain damage. The complaint also averred that Birth Center was negligent in failing to transfer the newborn child across the street to Bryn Mawr Hospital, where her condition could have been properly assessed and treated.

¶ 3 Upon being served with the complaint, Birth Center turned to St. Paul from whom it had purchased a one million dollar ($1,000,000.00) professional liability insurance policy. St. Paul immediately began an investigation of the Norris claim and hired counsel to defend Birth Center. Counsel engaged seven medical experts to evaluate the case. These experts concluded that Birth Center had acted within the requisite standard of care. After reviewing these opinions, St. Paul's medical liability supervisor determined that Birth Center had a fifty to sixty percent chance of successfully defending the claim. Based upon this estimate, the supervisor recommended that St. Paul make no offers of settlement. St. Paul adhered to this position throughout the remaining six years of the *Norris Case* litigation.

¶ 4 The Norrises' attorney also engaged a team of experts. After reviewing the facts and medical evidence in the *Norris Case*, the

---

claim within her liability insurance policy's limits and was released from the lawsuit. Dr. Soppas, like Birth Center, was insured under a professional liability insurance policy issued by St. Paul. Dr. Soppas remained a defendant throughout the *Norris Case* as St. Paul refused to negotiate or settle within her policy limits as well.

Norrises' experts determined that Birth Center was negligent in connection with the birth of Lindsey Norris. Furthermore, the experts concluded that Birth Center's negligence was the direct cause of Lindsey Norris' brain damage. This information was made available to all the parties involved in the *Norris Case,* including St. Paul.

¶ 5 On August 2, 1991, the Norrises made an offer to settle the case within Birth Center's policy limits. Three days later, Birth Center notified St. Paul that Birth Center was making a firm demand to settle the case within its policy limits. On August 7, 1991, St. Paul informed Birth Center's private counsel that it continued to refuse to negotiate or settle the case.

¶ 6 On August 8, 1991, a pre-trial conference was held in the Common Pleas Court of Delaware County. During the course of the pre-trial conference, the presiding judge recommended settlement of the *Norris Case* within Birth Center's policy limits. St. Paul refused to negotiate or offer a settlement. Thereafter, the *Norris Case* was listed for a second pre-trial conference with a different judge presiding. This judge also recommended settlement within Birth Center's policy limits. At this time, Birth Center demanded settlement in accordance with the judge's recommendation. Once again, St. Paul refused to negotiate or offer a settlement.

¶ 7 In early January of 1992, St. Paul requested the defense attorneys for Birth Center and Dr. Soppas to prepare pre-trial reports for its consideration. In her report to St. Paul, defense counsel for Birth Center stated that Birth Center had at best, a fifty-percent chance of successfully defending the lawsuit at trial. Furthermore, she advised that the jury verdict could range from one million, two hundred and fifty thousand dollars ($1,250,000.00) to one million, five hundred thousand dollars ($1,500,000.00). Defense counsel for Dr. Soppas stated in his report to St. Paul that Birth Center had a thirty-five percent chance of winning at trial and predicted a probable jury verdict of five million dollars ($5,000,000.00) to six million dollars ($6,000,000.00).

¶ 8 On January 27, 1992, Birth Center's executive director wrote a letter to St. Paul stating that she was very distressed by St. Paul's decision to take the case to trial despite the opportunity to settle it within Birth Center's policy limits. She expressed her concerns about a jury verdict in excess of the policy limits and the devastating effects such a verdict would have upon Birth Center's future existence. Birth Center's executive director also voiced these concerns to St. Paul's claims representative assigned to the case. The claims representative informed her that St. Paul tries "all of these bad baby cases, and we're going to trial." (N.T., 5/6/96 at 16; R.R. at 1343.) Furthermore, the claims representative stated that St. Paul was only obligated to pay the amount of the insurance policy, and that St. Paul had no obligation to cover any verdict in excess of the policy's limits. (*Id.*)

¶ 9 The case was subsequently transferred to the docket of a third judge who ultimately presided over the trial of the *Norris Case.* On February 5, 1993, the trial judge held a pre-trial conference in his chambers at which time he recommended settlement within Birth Center's policy limits. St. Paul refused to make any offer whatsoever. On February 12, 1993, the Norrises made another offer of settlement. Under the terms of the high/low offer, St. Paul would pay a non-refundable three hundred thousand dollars ($300,000.00) regardless of the verdict. If the jury returned a verdict in excess of Birth Center's policy limits, then the Norrises agreed to accept the policy limits as total satisfaction of the verdict. The settlement offer also provided that if the jury returned a verdict lower than Birth Center's maximum coverage, but higher than the low figure of three hundred thousand dollars, then the Norrises would accept such verdict as full satisfaction of Birth Center's liability. St. Paul refused this offer of settlement and made no counter-offer of settlement.

¶ 10 On February 16, 1993, the day of trial, a final pre-trial conference was held in the trial judge's robing room. At this time, the Norrises made the same settlement offer that they had extended to Birth Center on February 12, 1993. Birth Center indicated

that it would accept this offer of settlement. A representative of St. Paul, who was present during the robing room discussion, rejected this offer on the record. The judge stated: "[t]here is a clear indication of bad faith here. I think the insurance company is not proceeding in a responsible manner and is not discharging its fiduciary obligation to its insureds in this case ... I think this insurance company has operated in a highly irresponsible manner. I want it clear that they have turned this high/low offer of $300,000.00 down in which [sic] I think is a breach of their fiduciary responsibility to their insureds. And I want that clear on this record." (N.T., 2/16/93, at 15–19; R.R. at 2919–2923).

¶ 11 The case proceeded to trial immediately after the pre-trial conference. During the first two days of trial, the Norrises presented competent, persuasive, and highly sympathetic testimony, including a videotape recording of a day in the life of Lindsey Norris. After the presentation of the videotape, the trial judge called a recess and instructed all the parties to report to his robing room. At this time, the court instructed defense counsel for Birth Center and for Dr. Soppas to call St. Paul to see if it intended to make any settlement offer. When defense counsel for Birth Center returned from her telephone call, she stated to those present in the robing room: "They must be crazy. They're not offering a dime. They won't give me authority to offer any money in this case, you know, I can't believe it." (N.T., 5/3/96, at 69; R.R. at 1158).

¶ 12 The trial resumed. Birth Center made continued requests and written demands to settle within its policy limits, advising St. Paul that the case appeared to be going badly. St. Paul steadfastly refused to negotiate or make any offers. On March 4, 1993, the jury returned a verdict in favor of the Norrises for four million, five hundred thousand dollars ($4,500,000.00), with Birth Center liable for sixty percent (60%) of that amount, or two million, seven hundred thousand dollars ($2,700,000.00). The final verdict, as molded to include delay damages and interest, was seven million, one hundred ninety-six thousand, two hundred and thirty-

eight dollars ($7,196,238.00). Birth Center's ultimate liability amounted to four million, three hundred seventeen thousand, seven hundred and forty-three dollars ($4,317,-743.34).

¶ 13 After the verdict, Birth Center and its private counsel attempted to secure full indemnification from St. Paul. St. Paul hired independent counsel to analyze the law of bad faith and the advisability of indemnifying Birth Center for the verdict. On April 7, 1993, St. Paul agreed to indemnify Birth Center for the entire verdict. In consideration of its payment of the excess verdict, St. Paul requested a release from any and all claims Birth Center may have had against it, including all claims for bad faith and compensatory damages. Birth Center rejected this proposal because of the stated conditions. On August 2, 1993, St. Paul settled the entire Norris claim for five million dollars ($5,000,000.00). An order to settle, discontinue, and end was filed on September 20, 1993.

¶ 14 On June 3, 1994, Birth Center initiated the present action against St. Paul. In its complaint, Birth Center alleged, *inter alia*, that St. Paul breached its fiduciary duty to Birth Center, its implied covenant of good faith and fair dealing and its contract. Birth Center also averred that St. Paul's acts and omissions, with respect to its failure to negotiate and settle the *Norris Case* within the policy's limits, constituted negligence, reckless disregard for the rights of Birth Center, willful and wanton behavior, bad faith under 42 Pa.C.S.A. § 8371, and violations under various other statutes. Birth Center requested both compensatory and punitive damages. This case proceeded to trial on May 3, 1996. Following the trial, the court instructed the jury it could find St. Paul liable if the jury found by clear and convincing evidence (1) that St. Paul had acted in bad faith in refusing to negotiate and settle the *Norris Case* and (2) that its bad faith in handling the Norris claim was a substantial factor in bringing about the damages allegedly sustained by Birth Center. Furthermore, the trial court instructed the jury on compensatory and punitive damages. After consideration of the evidence, the jury found by clear and convincing evidence that St. Paul

had acted in bad faith and awarded Birth Center seven hundred thousand dollars ($700,000.00) in compensatory damages. The jury declined to award punitive damages.

¶ 15 On May 17, 1996, both parties filed motions for post-trial relief. Additionally, Birth Center filed a motion to mold the verdict. After the parties filed briefs in response to the respective motions, the trial court entered a corrected order on February 7, 1997 granting St. Paul's motion for J.N.O.V. Birth Center filed a motion for reconsideration, which the trial court granted. Following additional briefings and oral argument, the trial court entered several orders, which are the subject of this appeal and cross-appeal. On May 29, 1997, the trial court denied Birth Center's motion for reconsideration of the February 7, 1997 corrected order entering J.N.O.V. in favor of St. Paul. On June 2, 1997, the trial court denied those portions of St. Paul's motion for post-trial relief not previously granted. On June 3, 1997, the trial court denied Birth Center's motion to mold the verdict and for a new trial. The trial court entered judgment in favor of St. Paul on June 10, 1997. Birth Center subsequently filed three separate notices of appeal. St. Paul timely filed its notice of cross-appeal.

## ISSUES

¶ 16 On appeal, Birth Center raises the following issues for our review:

1. IS NOT JNOV OF A JURY VERDICT AWARD OF COMPENSATORY DAMAGES TO AN INSURED, IMPROPER AND REVERSIBLE ERROR WHERE THE JURY HAS FOUND BAD FAITH COMMITTED BY THE INSURER, AND HAS MADE AN AWARD WHEN A CONCURRENT BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY ACTION BEEN [SIC] ALLEGED, PROVEN AND CHARGED BY THE TRIAL JUDGE?

2. IS NOT JNOV OF A JURY VERDICT FINDING AN INSURANCE COMPANY IN BAD FAITH BY CLEAR AND CONVINCING EVIDENCE, IMPROPER AND REVERSIBLE ERROR WHERE THE INSURANCE COMPANY NEVER MADE ANY OFFER OF SETTLEMENT IN A BRAIN DAMAGED INFANT CASE, AND THE INSURANCE COMPANY HAS BEEN ADVISED BY ITS TRIAL COUNSEL:

 (a) THAT IT HAD ONLY A 35% TO 50% AT BEST CHANCE TO WIN, THAT A PROBABLE JURY VERDICT ESTIMATE WAS $1.25 [MILLION] TO $6 MILLION, AND THE INSURED'S COVERAGE WAS ONLY $1 MILLION; AND

 (b) THE ABOVE OPINIONS WERE NEVER RELAYED TO THE INSURED?

3. IS NOT AN INSURED ALLOWED TO RECOVER COMPENSATORY DAMAGES IN A BREACH OF CONTRACT ACTION AND A BREACH OF FIDUCIARY DUTY ACTION WHICH ARE BROUGHT CONCURRENTLY WITH AN ACTION UNDER 42 PA.C.S. § 8371 (BAD FAITH STATUTE), AND THE JURY VERDICT AWARD OF $700,000 IS NOT QUALIFIED OR CONDITIONAL?

4. IS NOT AN INSURER'S DUTY OF GOOD FAITH TOWARD AN INSURED IMPLICIT IN AN INSURANCE POLICY; AND ARE NOT THE INSURER'S BAD FAITH ACTIONS, THEREFORE, BREACHES OF THE CONTRACT OF INSURANCE (I.E. THE INSURANCE POLICY), AS WELL AS BAD FAITH UNDER SECTION 8371?

5. IS NOT JNOV IMPROPER IN A CASE WHERE COMPENSATORY DAMAGES HAVE BEEN AWARDED BY A JURY WHEN THE TRIAL JUDGE GIVES AS HIS REASON FOR JNOV THAT NO BAD FAITH EXISTS, OR THAT THE BAD FAITH IS NULLIFIED OR EXTINGUISHED WHERE THE INSURANCE COMPANY EVENTUALLY PAYS AN EXCESS VERDICT, DESPITE THE FACT THAT THE INSURED HAS SUFFERED DAM-

AGES, AFTER THE VERDICT AND BEFORE THE PAYMENT?

6. CANNOT AN INSURED COLLECT PROVEN COMPENSATORY DAMAGES FROM AN INSURER IN A CASE WHERE THE INSURER FAILS TO SETTLE A CASE AGAINST THE INSURED IN WHICH THE INSURER IS FOUND TO HAVE COMMITTED BAD FAITH IN ITS REFUSAL TO SETTLE THE CASE WITHIN THE POLICY LIMITS OF THE INSURED?

7. IS IT NOT IMPROPER AND REVERSIBLE ERROR FOR A TRIAL JUDGE TO NULLIFY A JURY VERDICT WHICH GRANTED PROVEN COMPENSATORY DAMAGES TO AN INSURED IN A CASE WHERE THE INSURED HAS PLEADED, PROVEN AND THE TRIAL JUDGE HAS CHARGED ON BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY AND COMPENSATORY DAMAGES, AND THE JURY HAS RENDERED A GENERAL VERDICT IN THE AMOUNT OF $700,000?

8. IS NOT THE ADMISSION BY AN INSURANCE COMPANY, IN ITS OWN RECORDS, THAT IT IS IN BAD FAITH FOR ITS FAILURE TO SETTLE THE UNDERLYING CASE WITHIN POLICY LIMITS, SUFFICIENT TO HAVE THE JURY DECIDE THAT SUCH FAILURE WAS A BREACH OF THE CONTRACT OF INSURANCE AND ALSO A BREACH OF THE FIDUCIARY DUTY OWED TO THE INSURED BY THE INSURANCE COMPANY?

9. SHOULD NOT AN INSURED BE REIMBURSED FOR SPECIAL INTEREST, COURT COSTS AND ATTORNEYS' FEES IN A CASE WHERE THE INSURED HAS BEEN REQUIRED TO INSTITUTE SUIT FOR BAD FAITH, TRY THE CASE AND FILE APPEALS FROM A JURY'S FINDING OF BAD FAITH JNOV OF A $700,000 JURY VERDICT AWARD, WHERE THE ATTORNEYS HAVE BEEN REQUIRED TO SPEND HUNDREDS OF HOURS PROSECUTING THE SAID CASE UNDER THE PROVISIONS OF 42 PA.C.S. § 8371?

10. SHOULD NOT AN INSURED BE GRANTED A NEW TRIAL ON PUNITIVE DAMAGES ONLY IN A BAD FAITH CASE WHERE BAD FAITH WAS FOUND BY A JURY, BUT WHERE THE TRIAL JUDGE REFUSED TO CHARGE ON ADDITIONAL ACTS OF BAD FAITH BY [INSURER] IN ATTEMPTING TO GET A RELEASE FOR BAD FAITH, SIMPLY BECAUSE THE ACTS WERE COMMITTED AFTER THE VERDICT IN THE UNDERLYING MALPRACTICE CASE?

(Birth Center's Brief at 7–8).

¶ 17 In its cross-appeal, St. Paul raises the following issues for our review:

1. WHETHER [BIRTH CENTER]'S DAMAGE CLAIM WAS TOO SPECULATIVE TO PRESENT TO THE JURY WHEN THE CLAIM CONSISTED OF LOST PROFITS DUE TO THE FAILURE OF [BIRTH CENTER] TO OBTAIN AN ADJACENT PROPERTY, AND [BIRTH CENTER]'S EXECUTIVE DIRECTOR ADMITTED THAT IF THE PROPERTY HAD BEEN ACQUIRED, SUBSTANTIAL COSTS WOULD HAVE BEEN INCURRED, INCLUDING MONTHLY MORTGAGE PAYMENTS, UTILITIES, MAINTENANCE EXPENSES AND PERSONNEL COSTS TO STAFF THE BUILDING AND NO EVIDENCE WAS PRESENTED TO THE JURY REGARDING THESE COSTS.

2. WHETHER THE TRIAL COURT VIOLATED THE ATTORNEY–CLIENT PRIVILEGE WHEN IT ORDERED THE PRODUCTION OF AND ADMITTED INTO EVIDENCE NOTES PREPARED BY [ST. PAUL]

BASED ON CONVERSATIONS WITH ITS COUNSEL IN CONNECTION WITH [BIRTH CENTER]'S CLAIMS, AND ALSO ADMITTED INTO EVIDENCE CORRESPONDENCE FROM COUNSEL FOR [ST. PAUL] ADDRESSED TO COUNSEL'S CLIENT.

3. WHETHER THE TRIAL COURT IMPROPERLY ADMITTED EVIDENCE OF CONDUCT OF [ST. PAUL] WHICH TOOK PLACE AFTER THE VERDICT IN THE UNDERLYING ACTION AS IT WAS NOT RELEVANT TO WHETHER ST. PAUL SHOULD HAVE SETTLED THE UNDERLYING CLAIM.

4. WHETHER THE TRIAL COURT IMPROPERLY PERMITTED UNFAIRLY PREJUDICIAL EVIDENCE CONCERNING THE OPINIONS OF TWO JUDGES FROM THE UNDERLYING CASE THAT [ST. PAUL] WAS ACTING IN BAD FAITH AND BREACHING ITS DUTIES TO ITS INSURED BY NOT SETTLING THE UNDERLYING CLAIM.

5. WHETHER THE COURT COMMITTED ERROR WHEN IT ADMITTED INTO EVIDENCE A HEARSAY STATEMENT BY COUNSEL FOR THE BIRTH CENTER IN THE UNDERLYING ACTION WHICH WAS NOT SUBJECT TO A RECOGNIZED HEARSAY EXCEPTION AND WHICH WAS UNFAIRLY PREJUDICIAL TO [ST. PAUL].

6. WHETHER THE TRIAL COURT COMMITTED ERROR WHEN IT REFUSED TO ADMIT EVIDENCE OF THE PREMIUM PAID BY THE BIRTH CENTER TO [ST. PAUL] WHEN THIS EVIDENCE SHOWED THAT IN EXCHANGE FOR THE $2,457.00 PREMIUM PAYMENT, [ST. PAUL] PAID APPROXIMATELY $200,000.00 TO DEFEND THE BIRTH CENTER AND $4,000,000.00 TO SETTLE THE CLAIM AGAINST [BIRTH CENTER AND DR. SOPPAS], WHEN THE POLICY LIMITS FOR THE BIRTH CENTER WERE $1,000,000.00.

(St. Paul's Brief at 3–4).

## BIRTH CENTER'S ISSUES ON APPEAL

¶ 18 Following a careful review of Birth Center's brief, we have determined that Birth Center has raised and argued six issues on appeal. We first address Birth Center's arguments challenging the trial court's order, which granted J.N.O.V. in favor of St. Paul. We then address Birth Center's fifth issue regarding punitive damages. Finally, we address Birth Center's issue regarding entitlement to interest, attorney's fees and costs pursuant to 42 Pa.C.S.A. § 8371.

¶ 19 When reviewing the propriety of an order granting or denying judgment notwithstanding the verdict, we must determine whether there is sufficient competent evidence to sustain the verdict. *Johnson v. Hyundai Motor America*, 698 A.2d 631, 635 (Pa.Super.1997), *appeal denied*, 551 Pa. 704, 712 A.2d 286 (1998) (citations omitted); *Rowinsky v. Sperling*, 452 Pa.Super. 215, 681 A.2d 785, 788 (1996), *appeal denied*, 547 Pa. 738, 690 A.2d 237 (1997) (quoting *Samuel Rappaport Family Partnership v. Meridian Bank*, 441 Pa.Super. 194, 657 A.2d 17, 20 (1995)). We must view the evidence in the light most favorable to the verdict winner and give the verdict winner the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. *Johnson, supra* at 635; *Rowinsky, supra* at 788. We apply this standard in all cases challenging the grant of a motion for J.N.O.V. *Shearer v. Reed*, 286 Pa.Super. 188, 428 A.2d 635, 637 (1981).

¶ 20 Pennsylvania law makes clear that a judgment notwithstanding the verdict is proper only in clear cases where the facts are such that no two reasonable minds could disagree that the verdict was improper. *Johnson, supra* at 635; *Rowinsky, supra* at 788. Questions of credibility and conflicts in evidence are for the fact-finder to resolve. *Commonwealth, Department of Transportation v. Patton*, 546 Pa. 562, 568, 686 A.2d 1302, 1305 (1997); *Miller v. Brass Rail Tavern, Inc.*, 702 A.2d 1072, 1076 (Pa.Super.1997) (citation omitted). This Court will

not substitute its judgment based upon a cold record for that of the fact-finder where issues of credibility and weight are concerned. *Id.*

¶ 21 Initially, Birth Center argues that the trial court erred in granting J.N.O.V. in favor of St. Paul on the basis that there was insufficient evidence to establish St. Paul acted in bad faith when it refused to settle the *Norris Case.* Specifically, Birth Center contends that St. Paul's refusal to settle the Norris claim within Birth Center's policy limits constituted a breach of St. Paul's duty under the policy to participate, in good faith, in settlement negotiations regarding the Norris claim. Birth Center concludes that the trial court erred in characterizing Birth Center's claim as raised exclusively under 42 Pa.C.S.A. § 8371. We agree.

■ ¶ 22 Under a liability insurance contract, an insurer undertakes three distinct obligations.[2, 3] *See Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 508, 223 A.2d 8, 11 (1966) (quoting *Gedeon v. State Farm Mut. Auto. Ins. Co.,* 410 Pa. 55, 58, 188 A.2d 320, 321 (1963)). The insurer agrees to indemnify against liability covered by the policy. *Gedeon, supra* at 58, 188 A.2d at 321. The insurer also agrees to defend all claims filed by an injured party that may potentially come within the coverage of the policy. *Id.* Additionally, the insurer assumes a fiduciary responsibility towards the insured and *becomes obligated* to act in good faith and with due care in representing the interests of its insured when handling, *inter alia,* all third party claims brought against the insured. *Id.* at 59, 188 A.2d at 322 (emphasis in original). The obligation to act with the utmost good faith arises by virtue of the insurer's assumption in the insurance contract of the right to handle all claims against its insured, including the right to make binding settlement. *Gedeon, supra* at 59, 188 A.2d at 322; *Brown, supra* at 109; *Hall v. Brown,* 363

Pa.Super. 415, 526 A.2d 413, 415 (1987), *appeal denied,* 522 Pa. 624, 564 A.2d 916 (1989).

■ ¶ 23 Generally, the duty to act in good faith in representing the interests of its insured compels the insurer to accord the interests of its insured the same faithful consideration it gives its own interests. *Cowden, supra* at 470, 134 A.2d at 228. The insurer must treat a claim against its insured as if the insurer alone were liable for the entire amount. *Id.* The insurer must also assess the impact upon its insured of the insurer's decision to settle or to litigate the claim against its insured. *Gray, supra.* This duty is said to arise not under the terms of the contract, but because of the contract, and to flow from the contract. *Id.*

■ ¶ 24 In the context of the insurer's decision to litigate or settle a third party claim brought against its insured, this Court has explained:

[A] decision not to settle must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed expertise of the company. This expertise must be applied, in a given case, to a consideration of *all the factors* bearing upon the advisability of a settlement for the protection of the insured. *While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more.* It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial.

*Shearer, supra* at 638 (citations omitted) (emphasis in original). *Accord Brown, supra*; *Hall, supra.* The *Shearer* standard

2. These obligations are in addition to any specific obligations undertaken by the insurer in exchange for the policy premium or miscellaneous duties assumed voluntarily by the insurer.

3. Although these cases address the insurer's duties in the context of automobile liability poli-

cies, these duties are not altered where the subject policy is for professional liability protection. *See Brown v. Candelora,* 708 A.2d 104 (Pa.Super.1998) (citing *Fedas v. Ins. Co. of Pa.,* 300 Pa. 555, 151 A. 285 (1930) (duty of good faith and fair dealing applies to all insurance policies)).

compels an insurer to make an intelligent and objective appraisal of the case by considering all the factors bearing upon the advisability of settlement. *Id.* An insurer does not satisfy the good faith standard merely by showing that it acted with sincerity. *Id.* Likewise, when an insurer decides to litigate the claim, it is not automatically liable to its insured simply because the outcome of the litigation is adverse to the insured. *Cowden, supra* at 472, 134 A.2d at 229. Thus, the insurer does not have an absolute duty to settle a claim just because it is possible that a judgment against the insured may exceed the policy limits. *Id.* at 470, 134 A.2d at 228. However, where there is little possibility of a verdict within the policy limits, the insurer's decision to litigate must be based on a reasonable assessment of the circumstances of the case **and** a real and substantial chance of a verdict in favor of the insured. *Id.* at 471, 134 A.2d at 228 (emphasis added); *Gedeon, supra* at 61, 188 A.2d at 323 (Concurring Opinion by Justice Eagen). Thus, the insurer's right under the policy to litigate or settle a claim against the insured is not a right to risk the insured's financial well-being unless there is both a real and a substantial chance of a finding of nonliability. *See Cowden, supra.* Applying this standard, we must now determine whether there was sufficient competent evidence to support the jury's verdict that St. Paul acted in bad faith in refusing to settle the *Norris Case. See Johnson, supra*; *Rowinsky, supra.*

 ¶ 25 In the instant case, the evidence adduced at trial showed that the Norrises had made repeated and consistent offers to settle their claim against Birth Center within the limits of Birth center's liability policy. Regardless of the Norrises' repeated efforts, St. Paul steadfastly refused to negotiate a settlement on behalf of Birth Center, despite the nature of the claimed injury and the fact that the victim was visibly and permanently brain damaged from birth, through no fault of her own. The record evidence also establishes that St. Paul knew the trial would involve contradictory expert testimony on the issue of Birth Center's negligence and the outcome of the trial would depend on which expert the jury believed. St. Paul also had reason to know that the injured child and her

parents would present appealing and sympathetic witnesses. Additionally, St. Paul had the benefit of three different judges' recommendations that the case should be settled within Birth Center's policy limits.

¶ 26 We are further persuaded by the evidence that, in 1992, Birth Center advised St. Paul of the distress over St. Paul's refusal to settle within the policy limits. Birth Center informed St. Paul that any verdict in excess of the policy limits could have a devastating effect on Birth Center's continued existence. St. Paul's claims representative responded that St. Paul tries "all of these bad baby cases...." Not only is this a crass characterization of the type of claim presented, it also indicates an agenda on the part of the insurer that is self-serving. St. Paul's policy permits the inference that the insurer does not duly consider the facts and circumstances of each case when making its decision to litigate. In the same breath, the claims representative declared to Birth Center's executive director that St. Paul was only obligated to pay the policy limits but had no obligation to cover any excess verdict that may result from the trial. St. Paul rigidly refused to cap the damages within Birth Center's policy limits, although it had good reason to anticipate that any verdict against Birth Center would be in excess of Birth Center's policy limits, and that such verdict would jeopardize Birth Center's future existence.

¶ 27 The *Norris Case* was initiated in 1986. When the case went to trial, in early 1993, St. Paul had reason to know that a favorable verdict was unlikely. By then, Counsel for its insured had advised St. Paul that they had a less than fifty-percent chance of successfully defending the case. Predictions as to the amount of a possible excess verdict had also increased. Nevertheless, after the Norris trial commenced and the Norrises' case was proceeding very favorably, St. Paul still rejected their offers to settle and refused to negotiate or discuss any settlement whatsoever. Under the facts of this case, the jury was entitled to conclude that an intelligent and objective insurer would not have refused an offer to settle within the policy limits. *See Shearer, supra* (holding

that evidence was sufficient to support jury's conclusion that insurer's refusal to offer to settle had not been an intelligent and objective decision where insurer knew that: (1) any verdict would likely be in excess of insured's policy limits; (2) there would be conflicting testimony on material trial issue; and (3) in view of age of victim and permanency of injured condition, opposing party would present appealing and sympathetic sight to jury). Here, St. Paul's unrelenting decision to litigate the *Norris Case* cannot be considered honest, objective and intelligent as its decision not to compromise was against the facts, the advice of trial counsel, the repeated admonitions of the court and the ardent appeals of its insured. Accordingly, we conclude, the evidence was sufficient to support the jury's finding that St. Paul had breached its duty of good faith, and that finding should not have been disturbed. *See Johnson, supra*; *Rowinsky, supra*.

¶ 28 We must now address whether compensatory damages are available to Birth Center in this action or whether the payment of the excess verdict by St. Paul extinguished all claims Birth Center may have had against St. Paul. Birth Center argues that St. Paul's payment of the excess verdict does not compensate Birth Center for the losses it sustained as a result of St. Paul's decision not to settle. Among other assertions, Birth Center claims to have sustained damage to its reputation, and to have lost client revenues, profits, and business opportunities in the form of a lost mortgage for expansion of its facility. Thus, Birth Center concludes, it is also entitled to the jury's award of compensatory damages.

¶ 29 St. Paul argues that its payment of the excess verdict extinguishes Birth Center's cause of action for breach of duty of good faith, as a matter of law, regardless of Birth Center's other claims. St. Paul also maintains that the statutory bad faith damages[4] are exclusive and do not provide for compensatory damages. Thus, St. Paul concludes that Birth Center is not entitled to any additional damages.

¶ 30 Pennsylvania law makes clear that an insurer may be liable regardless of the limits of the policy for the entire amount of the judgment entered against the insured if it unreasonably refuses an offer of settlement. *Cowden, supra* at 469, 134 A.2d at 227; *Gedeon, supra* at 59, 188 A.2d at 322; *Shearer, supra* at 637. If an insurer does not intelligently and objectively appraise the advisability of settlement, the insurer may be liable for those damages which will place the insured in the position it would have been in had the obligation of the insurer been performed. *Gedeon, supra*, at 59 n. 5, 188 A.2d at 322 n. 5. Recent Pennsylvania law also suggests that an insured is not restricted solely to the amount of the excess liability judgment but may also include, *inter alia*, compensatory damages for foreseeable losses proximately caused by the insured's breach of the fiduciary duties owed to its insured as a result of the contractual relationship. *See Brown, supra* at 110. This precise issue appears to be one of first impression in Pennsylvania.

¶ 31 The *Cowden, Gedeon, Shearer* line of cases do not disclose whether the claimants had asked for damages other than the amount of the excess verdict and offer us less guidance than we expected. To read these cases as precluding recovery for reasonably foreseeable damages proximately caused by the insurer's unintelligent and unreasonable refusal to settle the third party claim takes an unrealistic and myopic view of the insurer's duty in this context. The fiduciary relationship arising out of the insurance contract is based upon the trust and reliance that the insured is required to place in the insurer as a result of the unequal bargain and the insurer's retention of discretionary control over the decision to settle or litigate

---

4. § 8371. **Actions on insurance policies.**

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

the claim. Moreover, the passage of 42 Pa. C.S.A. § 8371 emphasizes the importance of placing the insured in the position it would have been in had the obligation of the insurer been performed. *See Gedeon, supra.*

¶ 32 It is the unreasonable failure to settle the third-party claim that breaches the insurer's duty and causes injury and loss to the insured, the most obvious of which is the excess verdict. St. Paul's breach of this duty is not a breach of the terms of the contract but a breach of the duty, which arises because of the contract and flows from it. *See Gray, supra.* Thus, the argument that the insurer does not act in bad faith so long as it pays the excess verdict casts the insurer's duty of good faith too narrowly, as one merely of reimbursement for liability. Payment of the excess verdict alone, however, may not put the insured in the position it would have been in had the obligations of the insurer been fully performed. To the contrary, payment of the excess verdict may only partially cure the insurer's wrongful conduct.[5] *See Gedeon, supra.*

¶ 33 We cannot agree with St. Paul that a rule exposing an insurer to a bad faith suit despite its voluntarily satisfaction of an excess verdict creates a disincentive to pay the excess judgment. To the contrary, one can argue with equal conviction that an insurer will be more motivated to assess the facts and circumstances of the case with intelligence and objectivity when it knows that it may be liable for known or reasonably foreseeable losses in addition to an excess verdict. Moreover, payment of the excess verdict still works to limit the insured's potential recovery in a bad faith claim that may otherwise be subject to the full panoply of statutory damages. Thus, where an insurer exposes its insured to a verdict in excess of the insured's policy limits without a real and substantial possibility of prevailing, an insur-

er cannot avoid all liability for bad faith simply by paying the excess judgment if the insured can prove it has suffered other legally cognizable damages as a result of the insurer's breach of fiduciary duty. Accordingly, we hold, in the context of the insurer's unreasonable refusal to settle a third-party claim within the policy limits, an insurer may be liable to its insured for payment of an excess verdict and compensatory damages for losses that are known or reasonably foreseeable at the time of the breach [6], as well as interest, attorney's fees and costs, and punitive damages under the statute.

¶ 34 Birth Center next contends the trial court erred in entering J.N.O.V. in favor of St. Paul on the basis that the court thought it had not charged the jury on Birth Center's breach of contract claim. Thus, Birth Center claims, the trial court erred when it decided that the jury was precluded from awarding Birth Center compensatory damages under a breach of contract theory because it had not been so instructed. We agree with Birth Center.

¶ 35 The record establishes that the trial court did in fact properly and fully instruct the jury on Birth Center's breach of contract claim. The trial court also instructed the jury that "[Birth Center] must establish by clear and convincing evidence that [St. Paul] violated its duty of good faith and fair dealing owed to its insured and that such violation of that duty was the legal cause of the damages sustained by the plaintiffs." (N.T., 5/10/96, at 236; R.R. at 2661).[7] The trial court also properly instructed the jury on the good faith standard as it applies to the insurer's decision not to settle. (*Id.* at 239–44; R.R. at 2664–69). Finally, the trial court properly charged the jury on damages as follows:

5. A similar presentation of this reasoning can be found in *Campbell v. State Farm Mut. Automobile Ins. Co.*, 840 P.2d 130 (Utah Ct.App.1992), *cert. denied*, 853 P.2d 897 (Utah 1992).

6. The breach occurs when the insurer wrongfully refuses to settle the claim; that is, when it becomes reasonably evident that there is no real and substantial chance of a finding of nonliability.

7. Pennsylvania law states that, unlike ordinary claims for breach of contract which require proof by a preponderance of the evidence, a breach of contract claim involving an insurer's bad faith conduct in the breach must be proven by clear and convincing evidence. *See Cowden, supra* at 472, 134 A.2d at 229; *Brown, supra* at 109; *Hall, supra* at 415–16.

I am first going to talk about compensatory damages. Where one party to a contract breaches that contract, the other party may recover for those injuries which have been proved to you with reasonable certainty. Certainly the measure of damages is the sum which will – generally the measure of damages i[s] that sum which will compensate the [Birth Center] for the losses sustained as a result of [St.Paul]'s conduct.

If you find that ... St. Paul breached its contract with The Birth Center, you must then decide based on all of the evidence presented what amount of money will compensate the [Birth Center] for those injuries, which were a direct and foreseeable result of the breach by St. Paul which the parties could have reasonably foreseen at the time of the [St. Paul]'s breach of the contract.

[Birth Center] claims that it is entitled to compensatory damages to compensate it for losses caused to it by [St. Paul]'s bad faith breach of its duties. These damages which the [Birth Center] claims, I've categorized in this case. This is not binding on you, you may use your own recollection and judgment. Loss of business due to the loss of opportunity to purchase the adjacent property required for expansion to handle additional clients necessary to remain financially viable. Loss of clients caused by actual cancellations due to the verdict and award and the degree of adverse publicity generated thereby. Loss of future clients caused by the verdict and

the award and the adverse publicity generated thereby. Other expenses incurred and losses sustained due to the loss of opportunity to purchase the adjacent property, including partial loss of deposit and private attorney's fees ... in the *Norris* case.

(N.T., 5/10/96, at 246–47; R.R. at 2671–73.) Thus, we conclude that the trial court mistakenly determined that it had not instructed the jury on Birth Center's breach of contract claim. Accordingly, the jury was not precluded from awarding compensatory damages for breach of contract.[8, 9]

¶ 36 In its final issue challenging the propriety of J.N.O.V., Birth Center argues that the trial court erred in finding that an insured has no common law cause of action for an insurer's bad faith in handling third party claims brought against the insured. Due to our preceding discussion, we need not again address this issue.

¶ 37 Birth Center also complains that it is entitled to a new trial on punitive damages. Birth Center contends that the trial court committed reversible error by not instructing the jury that St. Paul's conduct after the verdict in the *Norris Case* was evidence of bad faith, thereby warranting an award of punitive damages. We disagree.

¶ 38 Generally, a trial judge has wide latitude in his or her choice of language when charging a jury, provided that the instruction fully and adequately conveys the applicable law. *Wilson v. Anderson*, 420

---

**8.** St. Paul also contends that the jury was never asked to determine whether it had breached its insurance contract with Birth Center. A review of the jury's verdict establishes that the jury found that St. Paul had acted in bad faith in handling the *Norris Case*. (*See* verdict slip, dated May 10, 1996 at 1; R.R. at 2710). Furthermore, the jury was instructed that a finding of bad faith constituted a breach of St. Paul's fiduciary duty owed to Birth Center by virtue of its assertion in the insurance contract of the right to handle all claims against Birth Center. (*See* N.T., 5/10/96 at 239–240; R.R. at 2664–2665). Thus, the jury's finding that St. Paul acted in bad faith in handling the *Norris Case* necessarily constitutes a finding that St. Paul breached its fiduciary duty to act in good faith in handling that third party claim. In light of our conclusion that the jury awarded compensatory damages to Birth Center to compensate it for St. Paul's breach of con-

tract, we need not address St. Paul's assertion that compensatory damages are not recoverable in a claim brought exclusively under Section 8371.

**9.** St. Paul argues that Birth Center was precluded from recovering under a breach of contract theory because St. Paul satisfied the only two duties required of an insurer under a liability insurance contract, i.e., the duty to defend and the duty to indemnify. St. Paul contends that a bad faith action based upon an insurer's refusal to settle a third party claim is purely extra-contractual. St. Paul's claim is disingenuous as it is contrary to well-settled Pennsylvania law. Thus, St. Paul's claim that it had no contractual duty to act in good faith when making its decision not to settle is utterly without merit.

Pa.Super. 169, 616 A.2d 34, 36 (1992); *Ruffing v. 84 Lumber Company*, 410 Pa.Super. 459, 600 A.2d 545, 547 (1991), *appeal denied,* 530 Pa. 666, 610 A.2d 46 (1992). Additionally, our Supreme Court has stated:

> [W]hen the propriety of the jury instruction of the trial court is at issue, those instructions must be viewed in toto to determine if any error has been committed. Unless the charge as a whole can be demonstrated to have caused prejudicial error, we will not reverse for isolated inaccuracies.

*Riddle Memorial Hospital v. Dohan*, 504 Pa. 571, 576, 475 A.2d 1314, 1316 (1984). *Accord Chanthavong v. Tran*, 452 Pa.Super. 378, 682 A.2d 334, 340 (1996); *Wilson, supra* at 36.

¶ 39 Instantly, the trial court accurately and comprehensively explained to the jury the law of bad faith and the proper application of punitive damages. (N.T., 5/10/96, at 238–52; R.R. at 2663–77). The trial court included a detailed explanation of an insurer's fiduciary duty to act in good faith when handling third party claims brought against its insured. Additionally, the trial court appropriately stated that the jury could only award punitive damages if it found that St. Paul's conduct was extreme and outrageous. After a thorough review and consideration of the jury charge as a whole, we conclude that Birth Center's issue challenging the trial court's general jury instructions on punitive damages warrants no relief. Therefore, the trial court properly denied Birth Center's motion for a new trial on punitive damages.

¶ 40 Finally, Birth Center claims that the trial court erred when it denied Birth Center's motion to mold the jury's verdict. Birth Center contends it was entitled to interest, attorney's fees and court costs under 42 Pa. C.S.A. § 8371. We agree.

¶ 41 Generally, parties to litigation are responsible for their own counsel fees and costs, unless otherwise provided by statutory authority, agreement of the parties, or some other recognized exception. *Chatham Communications, Inc. v. General Press Corp.*, 463 Pa. 292, 344 A.2d 837, 842 (1975). Pursuant to Section 8371, a court may award interest, attorney's fees and costs where the insurer has been found to have acted in bad faith toward its insured. 42 Pa.C.S.A. § 8371.

¶ 42 In the present case, the trial court granted St. Paul's motion for judgment notwithstanding the verdict. Thus, the court did not have the opportunity to mold the verdict to include interest, attorney's fees and costs. Due to the reversal of that decision on this appeal, we recognize that the trial court should now have an opportunity to determine Birth Center's entitlement to the remedies available under Section 8371. Accordingly, we remand the matter to the trial court for a determination of Birth Center's entitlement to interest and reasonable attorney's fees and costs related to Birth Center's bad faith action against St. Paul.[10]

¶ 43 Because Section 8371 provides no guidance on how a trial court should calculate attorney's fees, we hold that, when calculating a reasonable fee under Section 8371, the trial court must consider the factors set forth in Pa.R.C.P. 1716:

(1) time and effort reasonably expended by the attorney in the litigation;

(2) quality of services rendered;

(3) results achieved and benefits conferred upon the class or upon the public;

(4) magnitude, complexity, and uniqueness of the litigation; and

(5) whether the receipt of a fee was contingent upon success.

Pa.R.C.P. 1716. *See also Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 532–39 (3rd Cir.1997). The calculation of a reasonable fee should begin with the actual number of hours spent in pursuing the claim[11] multiplied by a reasonable rate.

10. We remand this matter to the trial court because, traditionally, the determination of the amount of attorney's fees and interest awarded is left to the trial judge. However, we do not mean to imply that the statute requires the trial judge to determine all damages under the statute. To the contrary, we think that the term "court" is used in the statute in a generic sense, and presumes the assignment of duties to the judge and/or jury in the traditional manner of practice.

11. The term "claim" is not limited to the bad faith claim. Fees incurred in pursuing the insured's rights under the policy and/or protecting

Both the number of hours and the rate per hour shall be calculated on a basis reasonably reflective of the relevant market and the magnitude, complexity and uniqueness of the claim and the related task.

■■■■ ¶ 44 The court may also consider the discretionary application of a fee enhancement to reflect the contingent risk of the particular bad faith claim at issue. A contingent risk enhancement, however, shall be inappropriate where the factors creating the risk have been mitigated [12] or already taken into account in the calculation of number of hours times fee per hour. Additionally, fee recovery may include the reasonable fees incurred in the preparation and litigation of the fee petition if the client retains a material interest [13] in the fee litigation.

■■■ ¶ 45 The court's ultimate responsibility is the award of a "reasonable" fee. We are mindful that a fee award is discretionary under Section 8371. Thus, we conclude, the question of whether fees are awarded under the statute, and in what amount, must be subject to an abuse of discretion standard of review.

## ST. PAUL'S ISSUES ON CROSS–APPEAL

¶ 46 In its first issue on appeal, St. Paul challenges Birth Center's claim for lost profits as too speculative. St. Paul's brief begins with a boilerplate, general challenge to the compensatory damages as speculative. However, St. Paul specifically challenges Birth Center's claim for lost profits related to the estimated number of clients Birth Center would have serviced in the adjacent property

the insured's interests may also be recovered, including appellate fees, depending on the circumstances of the case, but only if the insured ultimately prevails on the bad faith claim.

**12.** *See Polselli, supra* at 535 (suggesting that the existence of a fee contract or an agreement for payment of a portion of the reasonable hourly rate regardless of result may significantly mitigate contingent risk).

**13.** Whether a client maintains a "material interest" means whether a client has anything to lose if the counsel fees are denied. If counsel must prevail on the fee petition to get paid at all, then the client has nothing to lose if counsel fees are

if it had been able to acquire that property. Thus, for the purposes of this appeal we will confine our discussion to that particular aspect of Birth Center's "lost profits" claim. *See* Pa.R.A.P. 2119; *Estate of Lakatosh*, 441 Pa.Super. 133, 656 A.2d 1378 (1995) (stating Superior Court will not review boilerplate claim that contains no developed argument and citations to relevant authority).[14]

■■■ ¶ 47 St. Paul specifically argues that Birth Center failed to make a true claim for lost profits occasioned by its inability to obtain the adjacent property because Birth Center did not give the jury a reasonable basis on which to calculate the alleged losses. St. Paul asserts that Birth Center's evidence should have included a fair estimate of the operating costs associated with the new facility which would offset the revenues generated by the new business. St. Paul states that this evidence should have been supplemented with expert testimony, market analyses, proof of profits generated by similar businesses, and other competent evidence to calculate the alleged loss with reasonable certainty. In the absence of any such evidence, St. Paul concludes that Birth Center's claim for "lost profits" is utterly speculative and should not have been submitted to the jury. We disagree.

■■■■ ¶ 48 Generally, damages are considered remote or speculative only if there is uncertainty regarding the existence of the damages, not if there is uncertainty concerning the precise calculation of the damages. *Kituskie v. Corbman*, 552 Pa. 275, 714 A.2d 1027 (1998). *See also Barrack v. Kolea*, 438 Pa.Super. 11, 651 A.2d 149 (1994

denied because the client is not liable for the fees. Under this scenario, the client does not maintain a material interest in the fee petition and attorneys' fees associated with the petition itself would be inappropriate.

**14.** St Paul first raised an objection to the damages in its pretrial motions in *limine*, wherein St. Paul sought to preclude all evidence of damages associated with Birth Center's lost opportunity to purchase the adjacent property. St. Paul also raised the damage issue in its motions for nonsuit and for a directed verdict (*see* N.T., May 10, 1996, at 78–82), and again in its post verdict motions.

(stating damages are not considered speculative when they are certain in fact, even though amount may be uncertain). Regarding speculative damages in the nature of lost profits, this Court has stated:

> [s]peculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference. The rule applicable to profits is in no respect different from that applicable to all gains prevented or losses suffered; it is proving income and outgo that the amount of any kind of profit is established.

*Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A.*, 315 Pa.Super. 469, 462 A.2d 686, 695 (1983) (quoting Restatement (Second) of Contracts § 331 cmt. c). Thus, lost profits may not be awarded where the evidence leaves the trier of fact without any guidance except speculation. *Warren v. Greenfield*, 407 Pa.Super. 600, 595 A.2d 1308, 1314 (1991); *Merion Spring Co., supra*. Sufficient evidence must be introduced to assist the fact finder toward a reasonably certain estimate of the amount of lost profits due to the breach. *Warren, supra*.

¶ 49 With specific reference to prospective lost profits, our Supreme Court has recognized the peculiar difficulties inherent in proving such damages. *Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215, 1225 (1987), *appeal denied*, 518 Pa. 627, 541 A.2d 1138 (1988) (*citing Massachusetts Bonding & Ins. Co. v. Johnston & Harder*, 343 Pa. 270, 22 A.2d 709 (1941)). In proving damages for lost profits, evidence of past profits in an established business can be a valid and reliable basis for estimating future profits. *Bolus, supra*.

¶ 50 "As with all determinations of damages, the question of whether and what amount of lost profits are recoverable is for the jury, and a reviewing court must accord great deference to the jury's determination." *Id.* 525 A.2d at 1225 (*citing Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983)). Our standard of review is very narrow. *Barrack, supra*. A jury award for compensatory damages should be reduced only if that award is plainly excessive or exorbitant. *Sprague v. Walter*, 441 Pa.Super. 1, 656 A.2d 890, 909

(1995), *appeal denied*, 543 Pa. 695, 670 A.2d 142 (1996). Excessiveness is not determined merely by the size of the verdict. *Id.* Courts should not interfere with the jury's determination unless the verdict is unsupported by the evidence or was the product of partiality, prejudice, mistake, corruption, or some other improper influence. *Lewis v. Pruitt*, 337 Pa.Super. 419, 487 A.2d 16 (1985).

¶ 51 In the instant case, Birth Center presented evidence of lost income in the amount of three hundred seventy-eight thousand and one hundred eighty-three dollars ($378,183.00) as a result of the cancelled financing for the adjacent property and established the existence of a "loss" for purposes of a damage award. *See Kituskie, supra*. In support of its damage claim, and its amount, Birth Center presented, *inter alia*, the testimony of Diana Krantz, its administrator.

¶ 52 On direct examination, Ms. Krantz testified to losses arising from seven different categories, including: (1) past and future loss of clients due inability to acquire space in new facility; (2) past and future loss of clients due to lack of privacy (space constraints in existing facility); (3) revenue spent for outside office space; (4) repairs made to existing facility; (5) loss of client revenue due to adverse publicity; (6) direct losses due to the lost mortgage on adjacent property (nonrefundable deposit); and (7) private attorney fees associated with the *Norris* case. Regarding the particular lost profits issue on appeal, Ms. Krantz testified that as a result of the adverse verdict in the *Norris* case, Birth Center lost its mortgage backing to acquire the adjacent property. Acquisition of the adjacent property would have meant enough space to accommodate thirty-nine (39) additional clients in 1994 and 1995; and thirteen (13) clients in 1996, by the time of trial. Multiplying the number of lost clients by the appropriate fee, Ms. Krantz arrived at a figure representing gross revenues lost as a result of the lost mortgage financing. (N.T., May 6, 1996, at 59–64; Birth Center's R.R. Vol. III at 1386a–1391a.)

¶ 53 On cross-examination, St. Paul vigorously challenged these damages. Ms.

Krantz admitted that her accounting did not make an adjustment for costs associated with the acquisition of the adjacent property, such as monthly mortgage payments, utilities, or maintenance. (*Id.* at 131–32; *id.* at 1458a–1459a.) However, she testified that her overhead and other costs in the existing facility had always been relatively low because Birth Center used very few supplies and no high-tech expensive equipment. Moreover, Birth Center maintained a staff on call regardless of whether there were any actual deliveries, so its operating costs were fixed. (*Id.* at 126–29; *id.* at 1453a–1456a.) Thus, the higher the number of deliveries the lower the costs to Birth Center per delivery. Ms. Krantz summarized that the number shown as "profit" in Birth Center's damages exhibit is the money Birth Center charged minus its fixed costs. (*Id.* at 129; *id.* at 1456a.) She further compared the previous years' profits and, assuming Birth Center had acquired the adjacent property, arrived at a number representing the net profit lost due directly to the loss of the adjacent property. Although Birth Center's calculations lack precise "outgo" expenses, we conclude that the jury had sufficient evidence that Birth Center has sustained losses and sufficient evidence to arrive at a reasonably certain estimate of these lost profits. *See Merion Spring Co, supra.* We again observe that this loss was just a segment of Birth Center's damages claim and the only aspect of the entire award challenged by St. Paul on appeal.

¶ 54 After a thorough review of the certified record, the transcripts of the proceedings including motions, jury instructions[15], jury charge, and the verdict slip[16], we are unable to determine how much of the verdict, if any, the jury awarded for lost profits associated with Birth's Center's failure to acquire the adjacent property. Indeed, other losses were also posted for the jury's consideration when it formulated its compensatory damage award. Therefore, applying our narrow standard of review, we have no reason to disturb the jury's determination. *See Barrack, supra.* Thus, we reinstate the full verdict in favor of Birth Center. *See Bolus, supra.*

¶ 55 In its remaining issues on cross appeal, St. Paul argues that the trial court erred when it denied its motion for new trial. Specifically, St. Paul asserts that several of the trial court's evidentiary rulings constitute reversible error warranting a new trial. We disagree.

¶ 56 Our standard for review regarding the admission and exclusion of evidence is well settled:

> Questions concerning the admissibility of evidence at trial are within the trial judge's sound discretion, and we will not reverse his decision absent an abuse of that discretion. *Engle v. West Penn Power Co.*, 409 Pa.Super. 462, 481, 598 A.2d 290, 299 (1991) *allocatur denied*, 529 Pa. 669, 605 A.2d 334 (1992). Generally, a trial judge should admit all relevant evidence unless a specific rule bars its admission. *Id.* Evidence is relevant if it "tends to make the

---

**15.** Upon review of the transcripts, we note that the parties agreed to a general jury instruction regarding speculative damages. The trial court asked Counsel to submit proposed points for charge and carefully discussed the instructions it intended to give. The trial court was meticulous in formulating its charge and frequently asked counsel for input. Although it had ample opportunity to do so, St. Paul did not ask the trial court to instruct the jury specifically on lost profits or otherwise request the jury to address Birth Center's damage claims by category. Instead, St. Paul was content with a simple "all or nothing" instruction on speculative damages. Accordingly, St. Paul must accept the outcome of its trial strategy to downplay the damages.

**16.** In *Henery v. Shadle*, 443 Pa.Super. 331, 661 A.2d 439 (1995), this Court emphasized the usefulness of special interrogatories in this modern era of complex litigation. Routine interrogatories on jury slips can oversimplify the verdict, whereas special interrogatories enable the jury to focus and resolve issues in an orderly manner as the jury moves to a final verdict. *Id.* 661 A.2d at 442 n. 1. Here, St. Paul did not request special interrogatories and the jury verdict slip provides only for a lump sum award. Of course, the decision to submit special interrogatories to the jury is left to the discretion of the trial court. *Id.* (citations omitted). By failing to request a more structured verdict slip, St. Paul did not inform the trial court or the jury, at a time when it could easily have been corrected, that St. Paul was interested in partitioning or apportioning the award for later challenge. Although not waiver in a technical sense, the absence of special interrogatories has thwarted our review of this issue.

fact at issue more or less probable or intelligible or to show the origin and history of the transaction between the parties and explain its character." *Id.* at 482, 598 A.2d at 299–300 (citations omitted). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful to the complaining litigant. *Whitman v. Riddell*, 324 Pa.Super. 177, 180, 471 A.2d 521, 522 (1984).

*Valentine v. Acme Markets, Inc.*, 455 Pa.Super. 256, 687 A.2d 1157, 1160 (1997). Moreover, we will not reverse the trial court's denial of a new trial unless there is a clear abuse of discretion or an error of law, which controlled the outcome of the case. *Chanthavong, supra* at 337–38 (quoting *Whyte v. Robinson*, 421 Pa.Super. 33, 617 A.2d 380, 382 (1992) (citations omitted)).

¶ 57 St. Paul first argues that the trial court violated both the attorney-client privilege and the work product doctrine when it admitted several items of evidence. Specifically, St. Paul claims that both the attorney-client privilege and the work product doctrine precluded discovery and admission into evidence of the following: (1) two letters prepared by St. Paul's counsel analyzing the law of bad faith in lieu of the verdict entered against Birth Center in the *Norris Case;* (2) handwritten notes prepared by St. Paul's liabilities claims supervisor based on his conversation with counsel concerning potential bad faith litigation; and (3) a typewritten note from St. Paul's liabilities claims supervisor setting forth counsel's comments and analysis. We disagree.

¶ 58 The attorney-client privilege has been codified in Pennsylvania at 42 Pa. C.S.A. § 5928. The statute states as follows:

In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case the client waives this privilege upon the trial.

42 Pa.C.S.A. § 5928. The attorney-client privilege, however, does not bar all testimony by counsel concerning communications with a client or a former client. *Panko v. Alessi*, 362 Pa.Super. 384, 524 A.2d 930, 932 (1987). It only bars discovery or testimony regarding confidential communications made by the client during the course of representation. *Id.* See also *Garvey v. National Grange Mutual Insurance Co.*, 167 F.R.D. 391 (E.D.Pa.1996) (holding that attorney-client privilege does not apply where documents at issue did not contain confidential communications from client).

¶ 59 Instantly, St. Paul did not object to the discovery of any of the information contained in the Norris file pertaining to the underlying *Norris Case.* Thus, any confidentiality involved was waived. Moreover, St. Paul simply requested its counsel to review the unprivileged information contained in the Norris file and advise it on the potential for bad faith claims. The letter(s) from St. Paul's counsel did not divulge any confidential communications by St. Paul to its counsel. Instead, the communications address the unprotected information contained in the Norris file pertaining to the underlying *Norris Case.* Thus, we conclude that the attorney-client privilege is inapplicable to the two letters prepared by St. Paul's counsel because the letters contain no protected communications from St. Paul to its attorney.

¶ 60 Further, the internal memoranda and notes of St. Paul's claims supervisor were not prepared at the direction of or for St. Paul's counsel. Instead, the claims supervisor prepared the notes and memoranda for himself and his supervisor. Hence, the attorney-client privilege is equally inapplicable to this material as it contained no confidential communications from St. Paul to its counsel.[17]

¶ 61 St. Paul also argues that the work product doctrine precluded discovery of its attorney's letters as well as its claims supervisor's memoranda and notes. The work product doctrine is codified in Rule 4003.3 of the Pennsylvania Rules of Civil

---

17. We make no decision about whether internal communications to in-house counsel fall under the aegis of the attorney-client privilege.

Procedure. This rule states in pertinent part:

Subject to the provisions of Rules 4003.4 and 4003.5, a party may obtain discovery of any matter discoverable under Rule 4003.1 even though prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative, including his attorney ... insurer or agent. The discovery shall not include disclosure of the mental impressions of a party's attorney or his conclusions, opinions, memoranda, notes or summaries, legal research or legal theories. With respect to the representative of a party other than the party's attorney, discovery shall not include disclosure of his mental impressions, conclusions, or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics.

Pa.R.C.P. 4003.3. The protection against the discovery of work product is designed to shelter "the mental processes of an attorney, providing a privileged area within which he can analyze and prepare his client's case." *Lepley v. Lycoming County Court of Common Pleas*, 481 Pa. 565, 573, 393 A.2d 306, 310 (1978) (quoting *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975)); *In Re Gartley*, 341 Pa.Super. 350, 491 A.2d 851, 859 (1985), aff'd, 513 Pa. 429, 521 A.2d 422 (1987) (citations omitted). *See also Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

■■■ ¶ 62 The protection of either an attorney's or representative's work product, however, is not absolute. The explanatory note to Rule 4003.3 states that work product may be discoverable in "situations under the Rule where the legal opinion of an attorney becomes a relevant issue in an action...." Pa.R.C.P. 4003.3 Explanatory Note. The explanatory note expressly refers to the situation presented in the instant case:

There may be situations where his [attorney's] conclusions or opinion as to the val-

ue or merit of a claim, not discoverable in the original litigation, should be discoverable in subsequent litigation. For example, suit is brought against an insurance carrier for unreasonable refusal to settle, resulting in a judgment against the insured in an amount in excess of the insurance coverage. Here discovery and inspection should be permitted in camera where required to weed out protected material.

Pa.R.C.P. 4003.3 Explanatory Note.[18] Moreover, where the legal opinions, conclusions, memoranda, notes or summaries, legal research or legal theories become a relevant issue in a case, the law in Pennsylvania is that the party seeking discovery need not show substantial need and undue hardship to obtain discovery of such materials. *Id.*

■■■ ¶ 63 Instantly, this case presents an issue of first impression in this jurisdiction insofar as it concerns an application of the work product doctrine in an action alleging an insurer's bad faith in handling a third-party claim brought against its insured. This case is complicated by the fact that St. Paul argued throughout this litigation that its payment of the excess verdict was *per se* evidence that it had acted in good faith in making its decision not to settle the underlying *Norris Case*. For example, in his closing remarks to the jury, St. Paul's counsel argued:

St. Paul defended The Birth Center, defended it aggressively and when that defense, despite all that hard work, didn't work and a very disappointing result happened, what did St. Paul do? The fact is that they stepped in and took responsibility for it and paid an enormous verdict, way beyond the limits of their policy. We submit that is entirely enough. We submit there is absolutely no bad faith here and we ask you to return such a verdict. Thank you.

---

**18.** The explanatory note to Rule 4003.3 states in pertinent part:

In two respects the amended Rule [4003.3] differs materially from Fed.R.Civ.P. 26(b)(3). First, the Federal Rule permits discovery only when the party seeking discovery shows substantial need of the material in the preparation of his case and is unable, without undue hardship, to obtain a substantial equivalent of the materials by other means. Under the general provisions of Rule 4003.3, such a showing of substantial need and undue hardship will not be required....

Pa.R.C.P. 4003.3 Explanatory Note.

(N.T., 5/10/96, at 222–224; R.R. at 2647–2648.)

 ¶ 64 St. Paul attempted to use the evidence of its payment of the excess verdict not merely as evidence to show that its conduct was not extreme and outrageous, or to limit Birth Center's contractual damages, but as conclusive evidence that St. Paul's decision not to settle the *Norris Case* was made in good faith. By framing its argument and the evidence in such a manner, St. Paul placed the reasons behind its payment of the excess verdict directly in issue. Thus, St. Paul made its state of mind, at the time it satisfied the excess verdict on behalf of Birth Center, relevant to the issue of whether its payment of the excess verdict was conclusive evidence of its good faith. Hence, assuming without deciding that the letters, memoranda, and notes were protected work product under 4003.3, St. Paul waived its right to challenge discovery of these materials on appeal because St. Paul made them relevant to its state of mind at the time it paid the excess verdict.[19]

 ¶ 65 Next, St. Paul argues that the trial court erred when it admitted, as opinion testimony, the several judges' statements that the *Norris Case* should be settled within Birth Center's policy limits. St. Paul also contends that the trial judge's statements to St. Paul's claims supervisor, that he believed St. Paul was acting in bad faith and had breached its fiduciary obligations to its insured, were improperly admitted as an expert opinion and were unduly prejudicial. We disagree.

¶ 66 Generally, all relevant evidence should be admitted unless a specific rule bars its admission. *Valentine, supra* at 1160 (Pa.Super.1997) (citing *Engle, supra* at 299). Pursuant to well settled Pennsylvania law:

[t]he trial judge has broad discretion regarding the admission of potentially misleading or confusing evidence. *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584 (1984). Relevant evidence may be excluded if its proba-

tive value is substantially outweighed by the danger of unfair prejudice or confusion. *Whistler Sportswear, Inc. v. Rullo*, 289 Pa.Super. 230, 433 A.2d 40 (1981). "The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value, and it is not for an appellate court to usurp that function." *Engle v. West Penn Power Co.*, 409 Pa.Super. 462, 484, 598 A.2d 290, 301 (1991), *appeal denied*, 529 Pa. 669, 605 A.2d 334 (1992) (citation omitted). "Prejudice," for purposes of this rule does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis. *Id.* Where evidence is alleged to be prejudicial, but is actually quite relevant to one of the inquiries in the case, it has been held that the probative value of the evidence exceeds its prejudicial nature, and the evidence is determined to be properly admitted. *See, e.g., Engle v. West Penn Power Co., supra*; *Scullion v. EMECO Indus., Inc.*, 398 Pa.Super. 294, 580 A.2d 1356 (1990), *appeal denied*, 527 Pa. 625, 592 A.2d 45 (1991).

*Sprague, supra* at 909.

¶ 67 The primary issue in this case was whether St. Paul objectively and intelligently evaluated the underlying *Norris Case*. Thus, the fact finder needed to consider all of the information available to St. Paul to determine whether St. Paul's decision was objective and intelligent under the circumstances. Accordingly, we conclude that the judges' statements to St. Paul regarding the advisability of settlement, as well as St. Paul's potential violation of its fiduciary duties owed to its insured, are "quite relevant" to the determination of whether St. Paul's decision not to settle was objective and intelligent. *See Sprague, supra.*

¶ 68 Moreover, the trial judge limited any unduly prejudicial effect of the judges' statements by not allowing the judges to testify in person before the jury. Instead, the trial court only permitted the notes of testimony

---

19. St. Paul also argues that its actions after the Norris verdict are irrelevant and should not have been admitted into evidence at trial. This issue is meritless in light of our conclusion that St.

Paul made its post verdict actions relevant in this bad faith action by arguing that payment of the excess verdict was evidence it had acted in good faith in the underlying *Norris Case.*

from the *Norris Case* to be read into evidence. Furthermore, the trial judge issued a cautionary instruction after the statements were read into evidence:

> I want to give you a cautionary instruction at this point, to further explain that concept, limited purpose testimony. The testimony you heard now is limited to the issue, which is the sole issue in this case, one of the issues in this case, as to the thinking process of [St. Paul] in determining whether it had a reasonable basis for believing it had a good chance to win the case.

(N.T., 5/3/96, at 44–45; R.R. at 1133–1134). This evidence was not offered as expert testimony, but only offered as information available to St. Paul when it made its decision not to settle the *Norris Case.* Accordingly, we conclude that the trial court did not abuse its broad discretion in admitting the judges' statements.

¶ 69 St. Paul also argues that the trial court erred when it admitted hearsay statements of counsel[20], hired to defend Birth Center, during the pendency of the *Norris Case.* Assuming without deciding that counsel's statements were inadmissible hearsay, we conclude that the admission of this evidence did not control the outcome of this case. In light of the overwhelming evidence presented at trial establishing that St. Paul's decision not to settle was neither intelligent nor objective, we leave undisturbed the trial court's order denying St. Paul's motion for new trial. *See Chanthavong, supra* at 337–38 (stating we will not reverse trial court's denial of motion for new trial unless error of law controlled outcome of case).

¶ 70 Finally, St. Paul argues that the trial court erred when it refused to admit evidence of the premium paid by Birth Center. St. Paul's sought to establish that it acted in good faith because it expended roughly five million dollars to defend and indemnify *Birth Center* in exchange for a two thousand, four hundred and fifty-seven dollar insurance premium. We disagree.

¶ 71 A trial court may exclude evidence that is irrelevant. *Burch v. Sears, Roebuck and Co.,* 320 Pa.Super. 444, 467 A.2d 615, 621 (1983) (*citing Lewis v. Mellor,* 259 Pa.Super. 509, 393 A.2d 941 (1978)). We hold that Birth Center's liability insurance premium has no bearing on the rights and obligations established under the insurance policy and the issues presented in this case. Any discrepancy between the premium charged and the amount of insurance purchased is a fact inherent in the nature of the insurance business and ought not to be later used against the insured where it is the insurer who sets the amount of the premium. The discrepancy between the amount of the premium paid by Birth Center and the amount ultimately paid by St. Paul is also irrelevant in this context because St. Paul had the opportunity to pay much less on the claim. In fact, in the context of a wrongful refusal to settle case, the discrepancy between the amount of the premium paid and the amount ultimately paid by St. Paul may have just as easily worked against St. Paul, making St. Paul appear foolish in the eyes of the jury. Thus, the trial court properly precluded admission of the premium paid by Birth Center, as it was irrelevant to the disposition of the issues presented in this case.

¶ 72 Based upon the foregoing analysis, we reverse the trial court's order, which granted J.N.O.V. in favor of St. Paul and reinstate the jury's verdict in favor of Birth Center. We remand this case to the trial court for a determination of Birth Center's entitlement to interest, reasonable attorney's fees and costs pursuant to 42 Pa.C.S.A. § 8371.

¶ 73 Reversed and remanded with instructions for further proceedings. Jurisdiction is relinquished.

---

20. The statements at issue were made by defense counsel for Birth center after she returned from a telephone conversation with St. Paul, the subject of which was settlement of the *Norris Case* and include: "[St. Paul] must be crazy. They're not offering a dime. They won't give me authority to offer any money in this case, you know, I can't believe it." (N.T., 5/3/96, at 69; R.R. at 1158).